## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

PATSY LEVANG                    )
c/o Wegman Hessler Valore    )
6055 Rockside Woods Blvd.    )
Cleveland, OH 44131,        )
                             )
CHERYL TUCK-SMITH      )
c/o Wegman Hessler Valore    )
6055 Rockside Woods Blvd.    )
Cleveland, OH 44131,        )
                             )
And                           )
                             )
SUSAN JENNINGS,         )
c/o Wegman Hessler Valore    )
6055 Rockside Woods Blvd.    )
Cleveland, OH 44131,        )
                             )
MARGO KNORR            )
c/o Wegman Hessler Valore    )
6055 Rockside Woods Blvd.    )
Cleveland, OH 44131,        )
                             )
KAREN POPE,              )
c/o Wegman Hessler Valore    )
6055 Rockside Woods Blvd.    )
Cleveland, OH 44131,        )
                             )
And                           )
                             )
ANN WITT                 )
c/o Wegman Hessler Valore    )
6055 Rockside Woods Blvd.    )
Cleveland, OH 44131,        )
                             )
derivatively on behalf of KAPPA KAPPA )
GAMMA FRATERNITY,      )
                             )
        Plaintiffs,          )
                             )
v.                            )
                             )
                             )

Case No.

Judge:

**VERIFIED COMPLAINT**

**(Jury Demand Endorsed Hereon)**

KAPPA KAPPA GAMMA FRATERNITY,          )
an Ohio non-profit corporation, as a Nominal   )
Defendant and as a Direct Defendant,    )
                                        )
c/o Kari Kittrell, Statutory Agent      )
6640 Riverside Drive Suite 200          )
Dublin OH 43017,                        )
                                        )
MARY PAT ROONEY, President,             )
Kappa Kappa Gamma Fraternity,           )
6640 Riverside Drive Suite 200          )
Dublin OH 43017,                        )
                                        )
MARIA BROWN, Vice President,            )
Kappa Kappa Gamma Fraternity,           )
6640 Riverside Drive Suite 200          )
Dublin OH 43017,                        )
                                        )
NANCY CAMPBELL, Vice President          )
Kappa Kappa Gamma Fraternity,           )
6640 Riverside Drive Suite 200          )
Dublin OH 43017,                        )
                                        )
BARB GOETTLEMAN, Vice President,        )
Kappa Kappa Gamma Fraternity,           )
6640 Riverside Drive Suite 200          )
Dublin OH 43017                         )
                                        )
LIZ WONG, Vice President,               )
Kappa Kappa Gamma Fraternity,           )
6640 Riverside Drive Suite 200          )
Dublin OH 43017,                        )
                                        )
KYLE DONNELLY, Treasurer,               )
Kappa Kappa Gamma Fraternity,           )
6640 Riverside Drive Suite 200          )
Dublin OH 43017,                        )
                                        )
And                                     )
                                        )
                                        )
                                        )
                                        )
                                        )
                                        )

BETH BLACK, Panhellenic Delegate )
Kappa Kappa Gamma Fraternity )
6640 Riverside Drive Suite 200 )
Dublin OH 43017 )
)
Defendants. )
)

Now come Plaintiffs, Patsy Levang ("Ms. Levang"), Cheryl Tuck-Smith ("Ms. Tuck-Smith"), for themselves, and Susan Jennings ("Ms. Jennings"), Margo Knorr ("Ms. Knorr"), Karen Pope ("Ms. Pope") and Ann Witt ("Ms. Witt") (collectively "Plaintiffs"), derivatively on behalf of Kappa Kappa Gamma Fraternity ("KKG" or "the Fraternity"), by and through their attorneys, Wegman Hessler Valore, and for their Complaint against Defendants KKG and KKG Fraternity Council members Mary Pat Rooney, Maria Brown, Nancy Campbell, Barb Goettleman, Liz Wong, Kyle Donnelly, and Beth Black (collectively "Fraternity Council")(collectively "KKG Defendants"), allege as follows:

## I.    PRELIMINARY STATEMENT

1.    Ms. Levang and Ms. Tuck-Smith are former members of KKG.

2.    Ms. Levang and Ms. Tuck-Smith were initiated as lifetime members of KKG when they were college students more than fifty (50) years ago and remained active alumnae members until their dismissal by the Fraternity Council on October 27, 2023.

3.    Throughout her membership, Ms. Levang served KKG in various positions: Traveling Field Secretary, Province Director, Regional Program Team, Trustee of the KKG Foundation, President of KKG Foundation, and co-leader of the KKG Leadership Academy Campaign, and Trainer.

4.     Cheryl Tuck-Smith was a founding member of the Alumnae Association in Chico, California and devoted several years as an advisor to the Historian of the KKG Gamma Omicron chapter at the University of Wyoming.

5.     Ms. Jennings, Ms. Knorr, Ms. Pope, and Ms. Witt are current alumnae members of KKG.

6.     Ms. Levang and Ms. Tuck-Smith became aware of facts underlying the litigation filed in the U.S. District Court for the District of Wyoming, filed under the caption *Westenbroek v. Kappa Kappa Gamma, et al.*, No. 2:23 CV 00051-ABJ (D. Wyo. Aug. 25, 2023), *appeal docketed*, No. 23-8065 (10th Cir. Sep. 26, 2023) ("the Lawsuit") that asserted derivative claims on behalf of the Fraternity related to allegations of misconduct by the Fraternity's leadership in an effort to secure the membership of a man as a new member.

7.     Ms. Levang and Ms. Tuck-Smith openly supported the plaintiffs in the Lawsuit and challenged KKG's conduct that gave rise to the Lawsuit.  On October 27, 2023, KKG expelled Ms. Levang and Ms. Tuck-Smith from membership in retaliation for their efforts.

8.     This case raises issues about whether a private, non-profit organization can disregard its mission and fiduciary duties, disavow its governing rules and bylaws, ignore its legal and ethical obligations, deceive and silence its members, and retaliate against those members who object to this conduct.

## II.     PARTIES, JURISDICTION, AND VENUE

9.     Ms. Levang is a citizen of North Dakota, in the county of McKenzie.

10.     Ms. Tuck-Smith is a citizen of Wyoming, in the county of Laramie.

11.     Ms. Jennings is a citizen of California, in the county of Orange.

12.     Ms. Knorr is a resident of North Dakota, in the county of McLean.

13.     Ms. Pope is a resident of Texas, in the county of Travis.

14.     Ms. Witt is a resident of Texas, in the county of Harris.

15.     KKG is a non-profit organization organized under the laws of the State of Ohio, with its principal place of business in Franklin County, Ohio.

16.     Defendants Mary Pat Rooney, a resident of Chicago, Illinois; Maria Brown, a resident of Columbus, Ohio; Nancy Campbell, a resident of Cookeville, Tennessee; Barb Goettelman, a resident of Englewood, Colorado; Liz Wong, a resident of Toronto, Canada; and Kyle Donnelly, a resident of Falls Church, Virginia are elected members of KKG's leadership team.  Defendant Beth Black, a resident of Dublin, Ohio was appointed to KKG's leadership team by the other members of the Fraternity Council as the delegate to the National Panhellenic Conference and serves as an ex-officio member of Fraternity Council (the "Panhellenic Delegate").

17.     Plaintiffs bring this action in the United States District for the Southern District of Ohio under 28 U.S.C. 1332(a)(1) as the parties are citizens of different states.

18.     Plaintiffs assert that the amount in controversy exceeds $75,000.00, and Defendants' conduct has resulted and will result in injury to Plaintiffs in an amount in excess of $75,000.00.

19.     Venue is proper in this judicial district under 28 U.S.C. 1391(b)(1) because Defendant KKG resides in this District.

### III.     FACTUAL BACKGROUND

### A.  KKG Was Formed As A Single-Sex Organization

20.     KKG is a national fraternity, formed in 1870 – thirty (30) years before the term "sorority" was used to refer to a university or collegiate women's society.  *See* "Sorority,"

OXFORD ENGLISH DICTIONARY ONLINE,

https://www.oed.com/search/dictionary/?scope=Entries&q=sorority (last visited Jan. 5, 2024).

21.     KKG was formed at a time when women were pushing social boundaries to achieve equality.[1] In 1871, for instance, men outnumbered women by nearly five to one on college campuses, and many colleges did not permit women to enroll at all.[2] Those female students who were able to attend college were unable to participate in extracurricular activities and were often segregated from male students in the classroom.

22.     KKG's founders sought to create an environment that offered female students the same opportunities that were available to male students. They formed KKG as a single-sex organization, conferring membership to women only.  *Exhibit 1,* Bylaws, Revised through 2022, Art. II, at 1.

23.     KKG's initial Bylaws provided that "[a]ny lady may become a candidate for membership who shall be of good moral character, and of above average talent; and who, at the time of proposal, either is or has been in attendance at some college or seminary."  *See* Denise Tessier, HISTORY 2000: KAPPA KAPPA GAMMA THROUGH THE YEARS 126 (2000).

24.     The support networks provided by sororities contributed to early achievements of women in a variety of areas including athletics, medicine, science, and government. For instance, KKG alumnae include women who became leaders in the suffragist movement, competed in (and won gold) in the first Olympic track event for women, and the first female ambulance surgeon.

---

[1] *See e.g.* "Sorority History is Women's History," HISTORY IT: WE GIVE HISTORY A FUTURE (Mar. 8, 2022), https://historyit.com/sorority-history-is-womens-history/.

[2] *See* Patsy Parker, Ph.D., *The Historical Role of Women in Higher Education*, in ADMINISTRATIVE ISSUES JOURNAL: CONNECTING EDUCATION, PRACTICE, AND RESEARCH, Vol. 5, No. 1: 3-14, DOI: 10.5929/2015.5.1.1 at 6–7 (Spring 2015).

*See* Fran Becque, Ph.D., *Women's Suffrage and Sororities*, FRATERNITY HISTORY & MORE (June 20, 2019) www.franbecque.com/feminists-and-sororities; "Sorority History is Women's History," HISTORY IT: WE GIVE HISTORY A FUTURE (Mar. 8, 2022), https://historyit.com/sorority-history-is-womens-history/.

25.    Indeed, women only-spaces allow women to put their own experiences front and center. Research has shown that women-only or all-girl spaces provide significant advantages. For example, students attending all-girl schools feel more comfortable being themselves and expressing their ideas, report greater gains on core academic and life skills, and feel as supported or more supported in their endeavors.[3]

26.    The benefits of women-only spaces have been recognized by KKG's own community.  In or about 2002, KKG conducted focus groups and personal interviews to identify the traits that exemplify the KKG experience. According to the more than 500 collegiate members, alumnae, parents of KKG members, KKG volunteers, and university administrators who participated in the survey, KKG not only provided members with sisterhood and a single-sex haven in a mainly coed campus environment, and diminished campus size and impersonality, but it also provided diversity of background and interest among its members. *In the Company of Leaders*, THE KEY (A KAPPA KAPPA GAMMA PUBLICATION), Vol 119, No. 2 (Summer 2002), at 9. (Emphasis added).

27.    KKG's current mission statement recognizes the continuing purpose of KKG as a women-only sorority: "We unite women to learn, grow, and inspire positive change throughout

---

[3] Richard A. Holmgren, Ph.D., Vice President for Information Services and Assessment, Allegheny College , "Steeped in Learning: The Student Experience at All-Girls Schools: A report prepared for the National Coalition of Girls' Schools," (2013), https://blog.collegevine.com/should-you-attend-a-womens-college/.

their lives." KAPPA KAPPA GAMMA, https://www.kappakappagamma.org/why-kappa/about-us/mission-values/ (last visited Jan. 13, 2024).

28.     As recently as December 2018, KKG took legal action to defend the importance of women-only organizations. KKG participated in the "Stand Up to Harvard Campaign" and joined Kappa Alpha Theta and other social organizations in filing a lawsuit against Harvard University, defending the rights of fraternities and sororities to maintain single-sex spaces. *Kappa Alpha Theta et al. v. Harvard University,* 397 F.Supp.3d 97 (D. Mass. 2019), ECF 1, Complaint.

29.     In bringing the *Kappa Alpha Theta* lawsuit, the sorority-plaintiffs asserted that Harvard University's sanctions policy[4] had a devastating effect "on all-women's social organizations despite their proven value."[5]

30.     Consistent with its core mission to unite and support women, KKG is a founding member of the National Panhellenic Conference (NPC), a cooperative organization of women's fraternities and sororities. Though the formation of the NPC evolved over time, its origins begin in 1891, when KKG invited all the Greek-letter women's collegiate fraternities (sororities) to a meeting in Boston. ***Exhibit 2***, NPC Manual of Information, 28th ed. 2024 ("NPC Manual"), at 10.[6]

31.     NPC member organizations are women's-only private social organizations. ***Exhibit 2***, NPC Manual, at 24.

_____

[4] The policy, which was to take effect with the class of 2021, barred members of single-gender clubs and Greek organizations from holding campus leadership positions, varsity team athletic captaincies, and from receiving College endorsement for prestigious fellowships. Notably, on June 29, 2019, Harvard discontinued the policy in response to the litigation. "Harvard Drops Its Sanctions Policy," KAPPA ALPHA THETA (July 3, 2020), https://www.kappaalphatheta.org/blog/fraternity/harvard-drops-its-sanctions-policy.

[5] "Kappa Kappa Gamma joins litigation and Stand Up to Harvard movement," KAPPA KAPPA GAMMA (Dec. 3, 2018), https://www.kappakappagamma.org/stay-connected/news/2018/sororities-fraternities-students-file-federal-and-state-suits-that-challenge-harvards-ban-on-single-sex-organizations/.

[6] Cited excerpts of the NPC Manual are attached hereto as ***Exhibit 2***. The complete manual can be accessed through the NPC website: https://npcwomen.org/wp-content/uploads/2023/03/MOI-Update-July-2023-1.pdf.

**B.  KKG is Bound to Defend the Single-Sex Nature of KKG Through Its Membership in NPC**

32.     The Unanimous Agreements entered into by KKG and 25 other NPC organizations are binding upon the member organizations.  ***Exhibit 2***, NPC Manual, at 17.  The Unanimous Agreement IX, "Protecting the Right of NPC Members to Remain Women's-Only Organizations," protects the single-sex nature of NPC-member organizations and expressly relies upon the support provided by the exemptions under Title IX and the freedom of association protected by the First Amendment of the U.S. Constitution. ***Exhibit 2***, NPC Manual, at 27.

33.     Unanimous Agreement IX provides that women's sororities of the NPC not only have the right to limit membership to women, but they "***shall*** defend their right to exist as single-sex organizations." *Id*. at 27 (Emphasis added).

34.     The single-sex nature of Greek organizations like NPC and KKG has been recognized through an exception to Title IX of the 1972 Education Amendments. 20 U.S.C. § 1681(a)(6).

35.     Sex and gender are not the same concepts.  "Sex" refers to biological differences between males and females[7]; while "gender" refers to a classification of individuals based on the social constructs distinguishing between males and females.[8]

---

[7] *See e.g.,* "Sex, sexual," NIH Style Guide, NATIONAL INSTITUTES OF HEALTH (Nov. 14, 2023), https://www.nih.gov/nih-style-guide/sex-gender-sexuality#:~:text=Sex%20is%20a%20biological%20descriptor,cellular%2C%20and%20basic%20biological%20phenomena.

[8] *See e.g.,* "Gender," NIH Style Guide, NATIONAL INSTITUTES OF HEALTH (Nov. 14, 2023), https://www.nih.gov/nih-style-guide/sex-gender-sexuality#:~:text=Sex%20is%20a%20biological%20descriptor,cellular%2C%20and%20basic%20biological%20phenomena.

36.     "[T]he meaning of 'sex' in Title IX refers to the biological and anatomical differences between male and female students at birth." *Franciscan Alliance Inc., v. Burwell*, 227 F. Supp.3d 600, 687 (N.D. Tex. 2016), citing *Texas v. U.S.,* 201 F. Supp.3d 810, 833 (N.D. Tex. 2016); *Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp.3d 657 (W.D. Pa. 2015).  *See also Adams v. Sch. Bd. of St. Johns Cty.,*57 F.4th 791, 812 (11th Cir. 2022).

37.     The Panhellenic Delegate is empowered to act and vote on behalf of KKG at the annual meeting of the NPC Council of Delegates.  ***Exhibit 2***, NPC Manual, at 10.

### C. KKG's Current Governing Documents Support The Single-Sex Nature of The Fraternity

38.     Under Ohio law, an association's constitution and bylaws "constitute a contract between the association and its members." *See Ulliman v. Ohio High School Athletic Assn.,* 184 Ohio App. 3d 52, 2009-Ohio-3756, 919 N.E.2d 763, ¶50 (2nd Dist.), citing *Internatl. Bhd. of Elec. Workers, Local Union No. 8 v. Gromnicki*, 139 Ohio App.3d 641, 646, 745 N.E.2d 449 (6th Dist. 2000).  Thus, an association's failure to comply with its constitution and bylaws constitutes a breach of that contract.

39.     In 2004, KKG filed its Amended and Restated Articles of Incorporation, which made clear that the Fraternity's purpose is, in part, to unite and advocate for women.  ***Exhibit 3***, Amended and Restated Articles of Incorporation.

40.     Consistent with the exemption under Title IX, KKG's Bylaws, as revised through the 2022 Convention, define the Fraternity's Purpose to include, in pertinent part, as follows:

> to unite ***women***, through membership, in a close bond of friendship, seeking to instill in them a spirit of mutual love and helpfulness, to the end that each member and the Fraternity at large may attain, social, moral and intellectual excellence;
> ***
> to advocate for and seek to address issues of concern for members and ***women*** in general; to provide opportunities for engagement throughout the lives of alumnae and encourage participation of alumnae in the Fraternity programs; and ***

***Exhibit 1***, Art. II, Purpose, at 1. (Emphasis added).

41.     The Bylaws also expressly restrict membership to women only: "A new member shall be a ***woman*** who has accepted an invitation to join the Fraternity but has not been initiated." ***Exhibit 1***, Art. III, Sec. 1, at 2. (Emphasis added). Further, "[a] ***woman*** may be selected to become a member of the Fraternity as a collegiate or alumna initiate provided specific qualifications are met." *Id*. Art. III, Sec. 2, at 3. (Emphasis added).

42.     The Bylaws mandate that KKG must also abide by the NPC Unanimous Agreements.  ***Exhibit 1***, Art. XV, Sec. 2, at 18.

43.     KKG has also adopted "Standing Rules" to govern the conduct of the Fraternity. The Standing Rules limit the qualifications for membership to being "a woman."

44.     The Standing Rules, as revised through the 2022 General Convention, describe the processes that must be followed when selecting a new member. KKG's Standing Rules do not include any language that supports expansion of Kappa membership to a man.  *See **Exhibit 4***, The Standing Rules of Kappa Kappa Gamma Fraternity.[9]

45.     KKG also has documents called the "Policies of Kappa Kappa Gamma Fraternity" which are "statements of intent and rules formulated by Fraternity Council to consistently carry out its duties as defined by the KKG Articles of Incorporation and the Fraternity Bylaws and Standing Rules." ***Exhibit 5***, Policies of Kappa Kappa Gamma Fraternity, 2023 at 1.

46.     KKG's Policies also restrict membership to women. Policy III imposes requirements on its college chapters that make clear KKG is a single- sex organization. Policy III

---

[9] KKG's Standing Rules and Fraternity Policies are not to be shared with the public. Therefore, copies of these documents are being filed under seal.

prohibits members from affiliating with a men's fraternity or allowing men to have a recognized

relationship with a chapter, saying these activities jeopardized KKG's single-sex status:

> Section 2. Auxiliary Groups. Participation in auxiliary groups of men's fraternities, including but not limited to little sisters, is prohibited and is in conflict with the National Panhellenic Conference Unanimous Agreements and Policies. The formation of male auxiliary groups, such as big brothers, is prohibited. The activities of such groups are not conducive to harmonious chapter operations and ***jeopardize our single-sex status***. Kappa chapters shall not bestow honorary status to individuals, such as Key Man or chapter sweetheart.

***Exhibit 5***, Policy III, Sec. 2, at 3. (Emphasis added.)

47. In addition, Policy VIII explicitly prohibits men from participating in KKG's

recruitment events:

> Men. Men shall not participate in any Kappa recruitment events, including the chapter's Bid Day event(s), according to the National Panhellenic Conference Unanimous Agreements.

***Exhibit 5***, Policy VIII, Sec. 3.I., at 12.

48. Policy IX requires all members of KKG to abide by and uphold the Unanimous

Agreements of NPC:

> All members of Kappa Kappa Gamma shall abide by and uphold the National Panhellenic Conference Unanimous Agreements as set forth in the current National Panhellenic Conference *Manual of Information*. All members shall also support the policies of the National Panhellenic Conference.

***Exhibit 5***, Policy IX, at 15. (Emphasis in original).

### D. KKG's Fraternity Council Has Improperly Attempted To Broaden Its Membership Criteria

49. The Fraternity Council recognized that KKG's Articles and Bylaws referencing

"women" intended to refer to women as the term was defined at KKG's formation, *e.g.*, adult

females.[10]  Nevertheless, the Fraternity Council unilaterally, and deceptively, took steps to broaden the membership of "women" to add individuals who identify as women.

50.     In 2015, the Fraternity Council issued a position statement on Membership Selection, which states in pertinent part: "Kappa Kappa Gamma is a single gender organization comprised of women ***and*** individuals who identify as women…" (Emphasis added).  At the same time, the Fraternity Council issued a position statement on "Single Gender Organizations," which stated that the "single gender nature of Greek-letter social organizations is also recognized by an exemption under the Educational Amendments to Title IX." ***Exhibit 6***, Kappa Kappa Gamma Position Statements, at 2.

51.     Contrary to the representations in these KKG Position Statements, the language of Title IX did not apply to gender or gender identity. *Franciscan Alliance Inc.,* 227 F. Supp.3d at 687. The express language of Title IX applies to discrimination on the basis of "sex," and the language of the statute exempts sororities from discriminating in their membership selection on that basis. Title IX refers to "both" sexes, meaning distinctively two - men or women.

52.     In 2018, KKG issued a "Guide for Supporting our LGBTQIA+ Members" ("the Guide"). KKG distributed the Guide to its District Directors and Alumnae Chapter Advisors and posted the Guide on the Fraternity's website." ***Exhibit 7***, the Guide.

53.     The Guide states, without citation to any of KKG's Articles, Bylaws, or other governing documents, that KKG is a "single gender organization comprised of women ***and*** individuals who identify as women." ***Exhibit 7***, at 1. (Emphasis added).

---

[10]   The plain meaning of the term remains unchanged. S*ee* DICTIONARY.COM, https://www.dictionary.com/browse/woman (last visited Jan. 13, 2024), and MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/woman (last visited Jan. 13, 2024) (both defining "woman" as an "an adult female person.")

54. Neither the Guide nor KKG's Position Statements were presented to the membership for review, debate, approval, or vote.

55. Neither the Guide nor KKG's Position Statements reflect the membership qualifications set forth in the Articles or Bylaws. In fact, the phrase "and individuals who identify as women" is not included as a permissible membership criterion in the Fraternity's governing documents. To the contrary, the Bylaws mandate that "[a] new member shall be a woman." *Exhibit 1*, Bylaws, Art. III, Sec. 1. A man is not a woman.

56. In April 2022, less than two months prior to the 2022 Convention, KKG issued a document to members, entitled "Bylaws and Standing Rules Revisions 2022: FAQS [Frequently Asked Questions]" (hereafter "FAQs"). *Exhibit 8*, Bylaws and Standing Rules Revisions 2022: FAQS.

57. Of note, the FAQs provide the following:

> Kappa Kappa Gamma is a single-gender organization comprised of women and individuals who identify as women whose governing documents do not discriminate in membership selection except by requiring good scholarship and ethical character. Please see Kappa's Position Statements on Membership Selection and Single-Gender Organizations.

*Exhibit 8*, FAQS, at 18.

58. The FAQs were not subject to a vote or otherwise approved by KKG membership at the 2022 Convention. The FAQs are not governing documents.

59. At no time prior to the filing of this Complaint did the Fraternity Council inform members of KKG that its interpretation of the word "woman" in its governing documents had changed, nor did they ever invite discussion or debate on this issue. Members were left to believe that the Position Statement and Guide had no force or effect because the governing documents had not been altered.

60. The Fraternity Council's current position that the meaning of the governing documents has changed – without any involvement from the members – is deceptive, unreasonable, and arbitrary and merely serves as an attempt to justify their fraudulent and misleading actions. It is evident that Fraternity Council conspired to deceive and conceal their actions from the membership. *See* Document 010110978097, Brief for Defendants-Appellees Kappa Kappa Gamma Fraternity, Mary Pat Rooney, and Kappa Kappa Gamma Building Co., *Westenbroek v. Kappa Kappa Gamma, et al.*, No. 2:23 CV 00051-ABJ (D. Wyo. Aug. 25, 2023), *appeal docketed*, No. 23-8065 (10th Cir. Sep. 26, 2023) (hereafter referred to as "Appellees' Brief").

61. KKG's Bylaws may only "be amended by a Convention by a two-thirds vote providing notice of the amendment indicating its exact content has been sent to the voting members of the Convention three months prior to the Convention." ***Exhibit 1***, Bylaws, Art. XXIV, at 20.

62. KKG has not complied with the requirements in Art. XXIV to amend the Bylaws to broaden the Fraternity's Purpose to include both "women ***and*** individuals who identify as women." (Emphasis added).

63. Similarly, the Standing Rules require a majority vote if submitted in writing with three-month's notice prior to the Convention or by a two-thirds vote, if made without notice. ***Exhibit 4***, Standing Rules, Sec. 8.0, Amendments, at 25. KKG has made no effort to revise its Standing Rules in accordance with this requirement.

64. By covertly adding individuals who identify as women to the membership criterion, Fraternity Council attempted to make a fundamental change of policy that modified the Fraternity's Purpose and affected each and every existing student and alumnae member.

### E. In Order To Expand Membership Qualifications, Fraternity Council Has Demonstrated Unfair Bias To The Prejudice Of KKG's Female Members

65.     Beginning in or around early 2021, KKG admitted a male candidate ("the Candidate") as a member through its alumna[11] candidate selection process. On information and belief, the Candidate is KKG's first male member.

66.     To be admitted as an alumna candidate, alumnae must meet the membership requirements.  According to KKG's Articles, Bylaws, and Standing Rules, this means that an Alumna Candidate must be a woman. ***Exhibit 1***, Art. III, Sec. 2.A. and 2.C, at 3; ***Exhibit 3***, at 4; and ***Exhibit 4***, Rule 1.1, at 1.

67.     Admission as an alumna candidate member merely requires a three-fourths vote of Fraternity Council. ***Exhibit 4***, Rule 1.1.B, at 1. Fraternity members had no vote concerning the admission of a man into the fraternity, and only a few members were aware that this action was taken by the Fraternity Council.

68.     Once admitted, the Candidate was fast-tracked to a KKG leadership position, despite not having contributed the years of service to KKG that is consistently required of other long-time female members. Indeed, within one month of joining KKG, the Candidate was assigned a volunteer position as the Alumnae Advisor for a university chapter.

69.     Soon after, the Candidate was appointed by Fraternity Council and assigned a volunteer position on the Bylaws Committee.  In order to qualify for this position, alumnae must have been active in "Fraternity work." ***Exhibit 1***, Bylaws, Art. X. Sec. 5, at 15.  On information and belief, no other KKG member, or alumna candidate, has been named to the Bylaws Committee with the same limited "Fraternity work" experience as the Candidate.

---

[11] Use of the feminine case in the Standing Rules is not insignificant.

16

70.     In 2022, the Candidate was nominated for election to serve as a District Director. To qualify for a District Director position, a candidate shall be an alumna who had served the Fraternity in certain leadership positions (*e.g.*, service on the Bylaws Committee) within the past 10 years.  ***Exhibit 1***, Art. IV, Sec. 1. A.1. Qualifications, at 6.

71.     Indeed, the Candidate did have experience as a volunteer in Sigma Pi, his men's fraternity.  That relevant experience was hidden by the Candidate and Fraternity Council throughout the selection, nomination, and election process.  Only a few voting members at the Convention were aware that a man was slated for election.

72.     On information and belief, no other KKG member, or alumna candidate, has been nominated to a District Director position with such limited Fraternity experience as the Candidate.

73.     No efforts were made at the 2022 Convention through a vote of the members to expand or broaden KKG's member qualifications to include individuals who identify as women. And the Fraternity Council deceptively misrepresented to its members that the Candidate was qualified to be a member (*e.g.*, was a woman), who also met the qualification for the District Director position.  The Candidate was elected to the District Director position without voters being informed by the Fraternity Council or the Candidate that the Candidate is a man.

74.     Fraternity Council intentionally concealed this fact from members to ensure the Candidate was elected.

75.     The Candidate has currently applied for, and is being considered for, a position in leadership to be voted on through an on-line election in April 2024.  This position could include being elected to Fraternity Council or even president of KKG.

76.     Most members remain unaware that the Candidate is a man.

77.     Then, in late 2022, the University of Wyoming Gamma Omicron Chapter initiated and admitted, as a member, a man ("the Student").

78.     National Fraternity officials encouraged chapter officers to recruit the Student and guided chapter officers in the selection process.

79.     The Student's grade point average was substantially lower than required in the applicable academic excellence requirements.

80.     Chapter elections leading to the Student's membership were conducted using Google forms and were not confidential in violation of Fraternity and chapter rules and regulations that require the use of a specified voting program to ensure confidentiality.

81.     With the support and direction of the Fraternity Council, the Wyoming Chapter not only disregarded established academic excellence requirements but also violated required confidential voting rules to force the Student's membership.

82.     As a result of the Fraternity's misconduct, the Student was admitted and granted all privileges of membership, including access to the private living areas and facilities that are restricted to women.

83.     Several active members of the Wyoming Chapter challenged the Fraternity's conduct, but their concerns were disregarded. Chapter members who raised concerns regarding the Student's membership were advised that they did not honor KKG values and did not belong in the organization.

84.     As a result, six (6) members of the Fraternity filed the Lawsuit, a derivative suit on behalf of the Fraternity, which sought to preserve KKG's Purpose and enforce its rights as a single-sex organization.

### F. KKG's Retaliatory Attempts To Silence Opposition To Clear Violations of KKG's Articles, Bylaws and Standing Rules

85. Ms. Levang and Ms. Tuck-Smith learned of the facts giving rise to the Lawsuit, and specifically of the Fraternity's disregard for the single-sex nature of the organization, and they openly opposed the Fraternity's conduct and advocated to maintain the woman-only nature of the organization.

86. On May 2 and 3, 2023, for example, Ms. Tuck-Smith sent emails to Alumnae Association Presidents of KKG, in which she shared information about the Lawsuit (already a matter of public record), the facts leading up to it, and her concerns for the impact on the Fraternity. *Exhibit 9*, May 2, 2023 and May 3, 2023 Emails from Cheryl Tuck-Smith. Ms. Tuck-Smith assured the members, "Please know and understand that our goal is not to slander Kappa. It is to return our organization to one that lives up to its charter, bylaws, and mission, and listens to the realities of our female members." *Id.*

87. For her part, Ms. Levang initially reached out to the Fraternity Council to address her concerns. Receiving no response, she shared her concerns about the Lawsuit and importance of women-only spaces both through direct communications to members and certain media sources. For instance, on June 22, 2023, an op-ed written by Ms. Levang was published by the National Review. *Exhibit 10*, Patsy Levang, *Women Only Spaces Must Resist The Transgender Assault*, NATIONAL REVIEW (Oct. 25, 2023), https://www.nationalreview.com/2023/06/women-only-spaces-must-resist-the-transgender-assault. In it, Ms. Levang raised concerns that "entities and leaders who are supposed to defend women are increasingly pushing women's interests aside." *Id.* Ms. Levang also encouraged women to unite "to protect the integrity of women's spaces and rights" and "uphold the principles upon which organizations such as the Kappa Kappa Gamma

sorority were founded, fostering a supportive environment where women can thrive and achieve excellence." *Id*.

88.     The Fraternity Council immediately took steps to silence Ms. Levang, Ms. Tuck-Smith, and any other alumnae who opposed their views of the Lawsuit and/or who challenged their blatant disregard for the Fraternity's Articles, Bylaws, and Standing Rules.

89.     On May 25, 2023, Fraternity Standards Director, Jessica Coffield, sent correspondence to Ms. Tuck-Smith advising her to cease using KKG's membership lists to communicate with other members regarding these important issues and informing her that her access to member contact information had been revoked.  ***Exhibit 11***, May 25, 2023 Email from Jessica Coffield.

90.     Similar letters, threatening termination of membership, were sent to at least ten (10) other alumnae who either voiced concerns over the Fraternity Council's violations of the Articles, Bylaws, and Standing Rules and/or expressed support for the plaintiffs' Lawsuit. In addition, KKG blocked their access to membership information to prevent further communications with the membership on these issues.

91.     On August 23, 2023, Ms. Levang sent an email to Alumnae Presidents to which Ms. Tuck-Smith joined, affirming their commitment to KKG:

> We have shared information with this group not to harm or otherwise defame Kappa, but to keep you informed, which we think is beneficial for everyone. We simply want to uphold her charter and her bylaws. That is something every member is entitled to.

***Exhibit 12***, August 23, 2023 Email to KKG Alumnae Presidents.

92.     The actions taken by Ms. Tuck-Smith and Ms. Levang were in line with the NPC Unanimous Agreement IX, NPC Declaration of Freedom.  ***Exhibit 2***, NPC Manual, at 23–24.

93.     At no time did either Ms. Levang or Ms. Tuck-Smith represent herself as a spokesperson for KKG.

94.     At no time did either Ms. Levang or Ms. Tuck-Smith use or access membership information for anything other than Fraternity matters.

95.     At no time did either Ms. Levang or Ms. Tuck-Smith violate the human dignity policy or otherwise deny the existence of a transgender individual.

96.     Nevertheless, on September 12, 2023, Fraternity Council informed Ms. Levang and Ms. Tuck-Smith that they were being considered for dismissal based on their alleged conduct in violation of various Fraternity Policies. ***Exhibit 13*** and ***Exhibit 14***, Correspondence from Jessica Coffield to Ms. Levang and Ms. Tuck-Smith, respectively.

97.     As requested, Ms. Levang and Ms. Tuck-Smith duly responded, requesting KKG to specify the basis for the allegations against them and asking that KKG honor its Bylaws and Standing Rules. ***Exhibit 15*** and ***Exhibit 16***, September 26, 2023 Correspondence from Patsy Levang and Cheryl Tuck-Smith, respectively.

98.     Ms. Coffield responded to Ms. Levang and Ms. Tuck-Smith on October 16, 2023. Each instance of alleged misconduct identified in her letter involved their efforts to (i) advocate in support of the members bringing the Lawsuit, (ii) raise concerns regarding violations of Fraternity Bylaws and Standing Rules, (iii) advocate for the preservation of women-only spaces, and (iv) fulfill their obligations under both Policy IX and NPC Unanimous Agreement IX. ***See Exhibit 17*** and ***Exhibit 18***, October 16, 2023 Correspondence from Jessica Coffield to Patsy Levang and Cheryl Tuck-Smith, respectively.

99.     As requested in Ms. Coffield's letters, on October 24 and October 26, 2023, Ms. Tuck-Smith and Ms. Levang responded to the allegations asserted against them. ***See Exhibit 19***,

October 24, 2023 Correspondence from Cheryl Tuck-Smith to Jessica Coffield and *Exhibit 20*, October 26, 2023 Correspondence from Patsy Levang to Jessica Coffield.

100.     Rather than take corrective action to remedy the Fraternity's clear violations of the Articles, Bylaws, and Standing Rules which Ms. Levang and Ms. Tuck-Smith addressed in their responses, Fraternity Council voted to terminate their membership altogether.  *See Exhibit 21* and *Exhibit 22*, November 1, 2023 Correspondence from Kari Kittrell Poole to Patsy Levang and Cheryl Tuck-Smith, respectively.

101.     As demonstrated by the Fraternity Council's complete failure to address the misconduct reported by Ms. Levang and Ms. Tuck-Smith and the Fraternity Council's retaliatory actions in response, neither KKG nor Fraternity Council have established processes or procedures to protect whistleblowers, like Ms. Levang and Ms. Tuck-Smith, who place their membership at risk to protect the Fraternity's governing documents and prevent Fraternity Council from violating them.

102.     The Fraternity Council's decision to terminate Ms. Levang and Ms. Tuck-Smith has harmed their personal reputations.  For instance, Fraternity Council's justification that Ms. Levang and Ms. Tuck-Smith violated KKG's human dignity policy suggests to the membership that they have engaged in discriminatory, inflammatory, or inappropriate conduct, and members of KKG think less of them because of these false and improper allegations.

103.     The decision to terminate Ms. Tuck-Smith's membership has also caused her severe emotional distress for which she has been compelled to seek medical treatment.

### G. KKG's Misuse of Foundation Funds

104.    During the course of her membership in KKG, Ms. Levang has contributed nearly $200,000 in financial donations to KKG either directly or indirectly through the Kappa Kappa Gamma Foundation ("the Foundation").

105.    Three members of the Fraternity Council serve as Trustees of the Foundation.

106.    In seeking donations from KKG women, the Foundation represented that donations would be used to support KKG women through programs related to leadership training, scholarships, harm-prevention programs, preservation of KKG heritage, disaster relief, and confidential aid.

107.    Solicitations for donations reinforced the significance of KKG sisterhood as well as KKG's mission to support and promote women. Representative samples of the donation requests sent to Ms. Levang and other KKG members from 2018 to 2023 are attached hereto as *Exhibits 23*, *24*, *and 25*.

108.    Ms. Levang's financial contributions in response to these donor requests were subject to the condition that KKG not alter its mission to support and promote women and women's issues, as the term "women" was understood at the time of the contributions.

109.    The foregoing condition attached to these financial gifts has been violated by the actions of KKG and Fraternity Council.

110.    Ms. Levang and other members, including but not limited to Plaintiff Karen Pope, understood at the time of their gifts that "woman" referred to adult females, without regard to sexual orientation, and that it excludes men, without regard to how men may view themselves.

111.    To the extent that these member gifts have been used by KKG for purposes of benefiting men – the opposite of Ms. Levang's intent, they have been misused.

112.    If members had known of the Fraternity Council's intentions, many donations would not have been made.

## COUNT ONE
### (Breach Of Fiduciary Duty on behalf of Kappa Kappa Gamma Fraternity)

113.    Plaintiffs re-allege, re-assert, and incorporate each of the immediately preceding paragraphs in this Verified Complaint as if fully set forth herein.

114.    Ms. Jennings, Ms. Knorr, Ms. Pope, and Ms. Witt ("the Derivative Plaintiffs") bring this action on behalf of KKG and against the Fraternity Council for its violations of KKG's Articles of Incorporation, Bylaws, and Standing Rules.

115.    Prior to their respective dismissals, Ms. Levang and Ms. Tuck-Smith notified Fraternity Council that their conduct violated KKG's Articles, Bylaws, and Standing Rules, that they interfered with members' freedom of speech, engaged in a dishonest attempt to advance a political agenda, ignored clear violations of the Standing Rules, and retaliated against members for seeking to hold the leadership accountable for their conduct.  Ms. Levang and Ms. Tuck-Smith requested that the KKG leadership honor the Articles, Bylaws, and Standing Rules for the Fraternity.

116.    In lieu of taking actions consistent with KKG's governing documents, Fraternity Council voted to terminate their membership.

117.    The plaintiffs in the Lawsuit made repeated requests to the Fraternity Council to enforce the membership requirements set forth in the Articles, Bylaws, Standing Rules, and Unanimous Agreement IX, but the Fraternity Council denied that these governing documents limit membership to women alone and, therefore, denied their requests.  *See* ECF 6, Complaint, at ¶¶ 164–65.

118.    By letter dated January 9, 2024, the Plaintiffs submitted their Rule 23.1 demand for relief to KKG's counsel, with copies to KKG, and each Fraternity Council member. ***See Exhibit 26***.   To date, Plaintiffs have not received a substantive response to the assertions in their letter.

119.    To the extent any further demand to KKG or to Fraternity Council is required prior to filing this action, it would be futile.

120.    Under Ohio law, the regulations of an organization may make provisions related to the "qualifications, admission, … and suspension of members, and the termination of membership." R.C. 1702.11(A)(2).

121.    Under Ohio law, a corporation may "exercise all authority within the purposes stated in its articles or incidental to those purposes." R.C. 1702.12(F)(9).

122.    A director shall perform her duties "in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation…." R.C. 1702.30(B).

123.    The Fraternity Council has breached its fiduciary duties to KKG and its members.

124.    By attempting to circumvent the Articles, Bylaws, and Standing Rules through the implementation of policies and position statements that contradict the express terms contained therein and allowing the membership of men absent a valid change to the Articles and Bylaws, the Fraternity Council violated KKG's Articles of Incorporation, its Bylaws, and Standing Rules.

125.    Fraternity Council's conduct affects the rights of all student and alumnae members to participate in a single-sex, woman-only environment and undermines the very purpose for which the Fraternity exists.

126.    In advocating for, encouraging, promoting, accepting, and providing special treatment for those men, the Fraternity Council has violated the Articles, Bylaws, and Standing

Rules related to qualifications for membership and assignment of volunteer and leadership positions to members, taking away opportunities for women who meet these qualifications.

127.    In referring to Title IX in its Fraternity Bylaws, Standing Rules, and Policies, the Fraternity Council recognized the significance of the exemptions afforded under Title IX.

128.    Yet, by admitting men, the Fraternity Council has opened membership to individuals who are men.  In doing so, Fraternity Council has jeopardized KKG's right to operate as a single-sex organization under the exemptions in Title IX.

129.    Fraternity Council has adopted a political agenda through which it seeks to expand membership beyond women only.

130.    In doing so, Fraternity Council has not allowed Fraternity members a voice, and it has failed to follow the established and required procedures to engage the membership and ensure a valid, transparent vote on changes to KKG's governing documents regarding membership – the essence of what it means to be a sorority.

131.    The Fraternity Council's political agenda has polarized the membership, defeating KKG's primary purpose — to unite women.

132.    Under the leadership of the Fraternity Council, alumnae membership has decreased by more than forty-eight percent (48%) since 2020.[12]

133.    To date, more than 1,368 members and alumnae have signed a petition to preserve KKG's Purpose in uniting and advocating for women in a "single-sex" organization.

134.    As a result of Fraternity Council's conduct, KKG and KKG Foundation both face substantial losses of funding through direct donations and legacy gifts that will now be withheld.

---

[12] Based upon dues paying alumnae association members.

135.    The Fraternity Council has failed to act in the best interest of the Fraternity. If permitted to continue violating the Fraternity's Articles, Bylaws, and Standing Rules, Fraternity Council will further erode KKG's membership, its alumnae and donor support, and its more than 150-year history of supporting women.

136.    As a result of Fraternity Council's conduct, KKG members have been compelled to take action to enforce and protect the Articles, Bylaws, and Standing Rules in both the instant case and the Lawsuit.

137.    As a result of the Fraternity Council's conduct, KKG is compelled to incur damages in the form of fees and expenses, well in excess of $75,000 that arise not only from the pursuit of the instant derivative claim but also related to fees and expenses associated with the Lawsuit. The Fraternity Council is liable to KKG for these damages.

138.    Having breached their fiduciary duties to KKG, the current members of the Fraternity Council (including KKG's Panhellenic Delegate) should be removed from their positions, and a temporary council should be empaneled pending the installation of new council members at the 2024 convention following an online election process monitored by an independent auditor to ensure a proper election consistent with KKG Bylaws, including that no men are nominated to positions of leadership in KKG.

139.    Alternatively, KKG's Fraternity Council must be enjoined from violating the KKG's Articles, Bylaws, and Standing Rules; violating the Unanimous Agreements; retaliating against members who seek to have Fraternity Council uphold and comply with those governing documents; and ordered to rescind their actions in breach of their fiduciary duties to KKG.

## COUNT TWO
### (Ultra Vires Against Kappa Kappa Gamma Fraternity Council)

140.    Plaintiffs reallege, re-assert, and incorporate each of the immediately preceding paragraphs of this Verified Complaint, as if fully set forth herein.

141.    Plaintiffs Susan Jennings, Margo Knorr, Karen Pope, and Ann Witt are members of KKG in satisfaction of Section 1702.12(I) of the Ohio Revised Code.

142.    Fraternity Council exceeded its authority to act as required under Ohio Revised Code Section 1702.12.

143.    Fraternity Council failed to conduct KKG's affairs as set forth in its Bylaws, as in force and effect at the time.

144.    Fraternity Council failed to follow mandatory notice and voting procedures required, among other things, to modify its Bylaws.

145.    Any purported amendments of the KKG Bylaws adopted in breach of procedural requirements are invalid.

146.    The Candidate and the Student (and perhaps others) were purportedly admitted to KKG when ineligible at the time to stand for membership, and the Candidate was placed in positions of authority over KKG's corporate affairs, including the unlawful expansion of the scope of membership to include a class of individuals with whom the Candidate has an exceptionally high level of personal interest.

147.    Fraternity Council has misused Article V, Section 9 of the KKG Bylaws by endeavoring to silence, threaten, intimidate, and ultimately expel members, like Ms. Levang and Ms. Tuck-Smith, who oppose adding men to the definition of "women" as the term "women" was understood at the time they pledged or subscribed financially to membership in KKG and is understood today, to mean adult females.

28

148. Fraternity Council has subordinated the obligation of KKG, set forth in its Bylaws, to "advocate for and seek to address issues of concern for members and women in general" (**Exhibit 1**, Bylaws, Article II, at 1) to an agenda supportive of those men who demand to be treated as if they were women.

149. Fraternity Council exceeded their authority and/or acted without authority to silence Ms. Levang and Ms. Tuck-Smith, denying them access to membership information, communication resources, and ultimately terminating their membership from KKG, despite their being "lifetime members."

150. Fraternity Council deliberately and maliciously sought to silence women who stated concerns or support for other female members of KKG whose actions and statements were made in the spirit of KKG sisterhood with other females, as they understood the term "woman" to mean at the time of their initiation and financial subscriptions and as the term "woman" is commonly understood.

151. It is a stated purpose of KKG "to unite women" and to "provide opportunities for engagement throughout the lives of alumnae." **Exhibit 1**, Bylaws, Article II, at 1.

152. Expelling alumnae who are lifetime members on the basis of differing opinions or disfavored speech is inconsistent with the corporate purpose of KKG, has a chilling effect on other members, and is detrimental to KKG.

153. The dismissal of Ms. Levang and Ms. Tuck-Smith from KKG was undertaken in excess of KKG's corporate authority and/or in bad faith or an unauthorized manner.

154. Having exceeded their authority and breached their duties to KKG, the current members of the Fraternity Council should be removed from their positions, and a temporary council should be empaneled pending the installation of new council members at the 2024

convention following an online election process monitored by an independent auditor to ensure a proper election consistent with KKG Bylaws, including that no men are nominated to positions of leadership in KKG.

155.    Alternatively, KKG's Fraternity Council must be enjoined from violating KKG's Articles, Bylaws, and Standing Rules; violating the Unanimous Agreements; retaliating against members who seek to have Fraternity Council uphold and comply with those governing documents; and ordered to rescind their actions in breach of their fiduciary duties to KKG.

**COUNT THREE**
**(Fraud Against Kappa Kappa Gamma by Fraternity Council)**

156.    Plaintiffs reallege, re-assert, and incorporate each of the immediately preceding paragraphs of this Verified Complaint, as if fully set forth herein.

157.    At the time of their election to Fraternity Council, each member assumed an obligation, as a matter of law, to carry out her duties in good faith and to act in the best interest of KKG and its members.

158.    Beginning with the issuance of the KKG position statement on membership, Fraternity Council failed to disclose to the members a concerted agenda to undermine the single-sex nature of the organization and eviscerate the primary Purpose expressly set forth in KKG's Articles and Bylaws – to unite and advocate for women – without allowing the members to review, debate, approve, or vote on the critical changes.

159.    Having implemented policies that they now assert amended the meaning of the governing documents without either disclosing this change in interpretation or actually seeking amendments to the governing documents, the Fraternity Council acted in furtherance of this agenda by voting to allow the Candidate to join KKG and nominating him to serve in key leadership positions while concealing the fact that the Candidate was a man.

160. Likewise, Fraternity Council undertook concerted measures to circumvent established membership criteria and chapter voting procedures to ensure the admission of the Student to the Wyoming Chapter.

161. To date, Fraternity Council has deliberately failed to disclose to the members that established membership criteria and voting procedures will be modified in the event male candidates seek membership in the Fraternity.

162. Fraternity Council has failed to disclose to members that no processes or procedures have been established to ensure the physical safety and emotional well-being of college women who will be required to share previously designated women-only areas of Fraternity properties with men.

163. Nevertheless, Fraternity Council has deliberately represented, and continues to deliberately represent, to student, alumnae, and prospective members that KKG is "a women's organization" that "unites women to learn, grow, and inspire positive change throughout their lives." *See e.g.,* www.kappakappagamma.org/why-kappa.

164. Indeed, Fraternity Council has and continues to promote itself by claiming that KKG sorority life will provide "college women a safe and educational space to discover what's right for them," and give "women a familiar space … to develop leadership and professional skills." *Id.*

165. Fraternity Council has permitted, and continues to permit, the Foundation to solicit financial support from the membership by claiming donations will be used to support the Fraternity's mission and fulfill the evolving needs of ***women***. ***Exhibit 25***, December 28, 2023 Email to KKG members.

166.    Indeed, by way of illustration, and by no means limitation, throughout her membership, Ms. Levang donated nearly Two Hundred Thousand Dollars ($200,000.00) in funds to support KKG through the Foundation. In making these donations, Ms. Levang, and others like her, reasonably relied upon the representations made by KKG, Fraternity Council and the Foundation.

167.    Those funds were intended to be used for the benefit of women and women's issues, as the term "woman" was understood and intended by the donors at the time.

168.    Ms. Levang understood at the time of her gifts that "woman" refers to females, without regard to sexual orientation, and excludes men, without regard to how men may view themselves.

169.    To the extent that gifts made by Ms. Levang and others have been transferred to and used by KKG and are at risk of being used to benefit men, the opposite of Ms. Levang's intent, KKG has been unjustly enriched by its disregard for the express intention of the donor.

170.    The Derivative Plaintiffs, other members, and KKG reasonably relied, to KKG's detriment, on the representations of Fraternity Council.

171.    As a result of Fraternity Council's intentional and continued fraudulent misrepresentations, KKG members have been compelled to take action to enforce and protect the Articles, Bylaws, and Standing Rules in both the instant case and the Lawsuit.

172.    As a result of the Fraternity Council's fraud on KKG and its members, KKG has been compelled to incur damages in the form of fees and expenses, well in excess of $75,000 that arise not only from the pursuit of the instant derivative claim but also related to fees and expenses associated with the Lawsuit. The Fraternity Council is liable to KKG for these damages.

173.     As a result of the Fraternity Council's fraud on KKG and its members, KKG will suffer additional financial losses in the form of decreased membership and financial donations in an amount to be determined at trial, and for which the Fraternity Council is liable to KKG.

## COUNT FOUR
### (Civil Conspiracy by Fraternity Council)

174.     Plaintiffs reallege, re-assert, and incorporate each of the immediately preceding paragraphs of this Verified Complaint, as if fully set forth herein.

175.     In an effort to promote their agenda to undermine the single-sex nature of KKG and eviscerate the primary Purpose expressly set forth in KKG's Articles, Bylaws, and Standing Rules, the members of the Fraternity Council maliciously agreed, conspired and intentionally perpetrated a fraud on KKG and its members, disregarded their duties of loyalty, and retaliated against members who sought to protect KKG.

176.     Fraternity Council members prepared and issued the Guide and FAQs which purported to add "individuals who identify as women" to the membership qualifications without providing proper notice to the members of what Fraternity Council argues was a change to the meaning of the governing documents.  (Appellees Brief at 33–35.)

177.     Fraternity Council members voted on the admission of a male alumna candidate and then concealed his sex from the membership in order to secure his election to positions of leadership in KKG.

178.     Fraternity Council members agreed to disregard membership qualifications and voting procedures in order to improperly influence and coerce student members to approve the membership of a male student in the Wyoming Chapter.

179.     Fraternity Council improperly took retaliatory measures, including but not limited to, sending letters to alumnae threatening termination of their membership and/or removal from

volunteer positions, terminating access to membership resources, and terminating Ms. Levang and Ms. Tuck-Smith to silence alumnae members who opposed Fraternity Council's conduct in violating the Fraternity's Articles, Bylaws, and Standing Rules.

180.    As a result of the Fraternity Council's conduct, KKG has incurred damages in the form of legal expenses, decreased membership, and decreased financial donations excess of $75,000. The Fraternity Council is liable to KKG for these damages.

## COUNT FIVE
### (Violation of Ohio Constitution, Art. 11, Freedom of Speech)

181.    Plaintiffs reallege, re-assert, and incorporate each of the immediately preceding paragraphs of this Verified Complaint, as if fully set forth herein.

182.    Section 11, Article I of the Ohio Constitution provides that

***Every citizen may freely speak, write, and publish his sentiments on all subjects***, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.

(Emphasis added).

183.    The terms set forth in the first clause of Section 11, Article I create "a promise to affirmatively protect the right" of free speech. *Eastwood Mall, Inc. v. Slanco*, 68 Ohio St. 3d 221, 226, 626 N.E.2d 59 (1994) (Wright, J., dissenting), citing *Ferner v. Toledo–Lucas Cty. Convention & Visitors Bur., Inc.*, 80 Ohio App.3d 842, 848, 610 N.E.2d 1158 (6th Dist. 1992) (finding the Ohio Constitution additionally includes an affirmative grant of the right of free speech even when there is no state action.)

184.    As an Ohio citizen, KKG is subject to the laws of the State and has a duty to affirmatively protect and honor the freedom of speech protected under the Ohio Constitution.

185.    Neither KKG nor the Fraternity Council can, as a matter of law, establish Policies or engage in conduct that is contrary to Ohio law.

186.    KKG and Fraternity Council have violated their obligations under the Ohio Constitution to affirmatively protect and honor the freedom of speech applicable to its members. Indeed, in limiting the ability of the membership to speak freely among one another in opposition to the changes implemented solely by Fraternity Council, and in removing members from volunteer positions, threatening members with dismissal, and expelling Ms. Levang and Ms. Tuck-Smith for their opposition to the Fraternity Council's misconduct, KKG and Fraternity Council have undoubtedly chilled the rights of members to speak freely.

187.    The members of KKG, together with Ms. Levang and Ms. Tuck-Smith, were and remain entitled to rely on KKG's obligation to comply with Ohio law and to freely speak, write, and publish their opinions on any subject.

188.    Ms. Levang, Ms. Tuck-Smith, and all members of KKG were, and are, entitled to communicate with other KKG members, alumnae, and others regarding the Lawsuit and the facts giving rise to the Lawsuit.

189.    In both threatening their expulsion and ultimately voting to dismiss Ms. Levang and Ms. Tuck-Smith from the Fraternity, KKG and the Fraternity Council have infringed on their rights to freedom of speech under the Ohio Constitution, and they are liable to Ms. Levang and Ms. Tuck-Smith for their conduct.

190.    KKG and the Fraternity Council should be enjoined from violating the Ohio Constitution in limiting the membership's right to free speech and in retaliation for efforts by Ms. Levang, Ms. Tuck-Smith, and any other KKG member to uphold KKG's Purpose (as set forth in the Article and Bylaws) as well as the Unanimous Agreement IX, and they should be ordered to comply with KKG's governing documents.

191.    The Court should order the Fraternity Council's decision to dismiss Ms. Levang and Ms. Tuck-Smith rescinded such that their lifetime membership is reinstated and to rescind other actions taken against members for exercising their rights to free speech.

**COUNT SIX**
**(Breach of Contract on behalf of Ms. Levang and Ms. Tuck Smith –**
**Wrongful Termination of Lifetime Members)**

192.    Plaintiffs Patsy Levang and Cheryl Tuck-Smith reallege, re-assert, and incorporate each of the immediately preceding paragraphs of this Verified Complaint, as if fully set forth herein.

193.    The Bylaws constitute a contract between KKG and its members. *See Ulliman,* 184 Ohio App. 3d 52, 2009-Ohio-3756, 919 N.E.2d 763, ¶50 (2nd Dist.), citing *Internatl. Bhd. of Elec. Workers, Local Union No. 8 v. Gromnicki*, 139 Ohio App.3d 641, 646, 745 N.E.2d 449 (6th Dist. 2000).

194.    At the time of their termination, Ms. Levang and Ms. Tuck-Smith had been members of KKG for more than fifty (50) years.

195.    KKG's Bylaws represented that KKG would provide "opportunities for engagement throughout the lives of alumnae and encourage participation of alumnae in the Fraternity programs."  Exhibit 1, Bylaws, Art. II, at 1.

196.    Indeed, in soliciting donations from KKG's members on behalf of the Fraternity, the Foundation reiterates KKG's promise to support members "in every season of their lives:"

> Through the Foundation, Kappa keeps its promise to every member, throughout her life.  ***
> ***
> Your gift will help ensure the viability of our programming into the future — a future in which every Kappa, in every season of her life, can dream boldly and live fully.

*Exhibit 23*, October 10, 2019 Correspondence to KKG Members.

197.    Ms. Levang and Ms. Tuck-Smith honored and fulfilled their obligations to KKG under the Bylaws; accordingly, they are legally entitled to relief for KKG's failure to abide by the Bylaws.

198.    KKG, acting through the Fraternity Council, wrongly accused Ms. Levang and Ms. Tuck-Smith of violating various Fraternity Policies, including improper use of membership lists, communicating with media without KKG's prior approval, and "denying the existence of a transgender member."

199.    To the contrary, Ms. Levang and Ms. Tuck-Smith have acted to seek KKG's compliance with the Bylaws and to uphold the Unanimous Agreement IX, as they were required to do by Fraternity Policy IX, and have advocated for members who have been harmed in violation of the Bylaws.

200.    The Fraternity Council's assertions are wholly without merit and served only as a bad faith pretext to retaliate against Ms. Levang and Ms. Tuck-Smith for bringing to light the Fraternity Council's violations of KKG's Articles, Bylaws, and Standing Rules.

201.    KKG's Fraternity Policy XIV prohibits "retaliation in response to or related to a report of misconduct, including but not limited to…violations of … Kappa policy." *See Exhibit 4*. The Policy further precludes an act intended as retribution against a person for reporting… misconduct." *Id*.

202.    KKG, acting through Fraternity Council, wrongfully terminated Ms. Levang and Ms. Tuck-Smith in violation of its contract and its Policy against retaliation.

203.    KKG breached its contract to provide membership and engagement with Ms. Levang and Ms. Tuck-Smith throughout their lives, and Ms. Levang and Ms. Tuck-Smith have suffered harm as a result of KKG's breaches.

204.     KKG is liable to Ms. Levang and Ms. Tuck-Smith for its breaches.

### COUNT SEVEN
**(Promissory Estoppel on behalf of Ms. Levang and Ms. Tuck Smith
– Wrongful Termination of Lifetime Members)**

205.     Plaintiffs Patsy Levang and Cheryl Tuck-Smith reallege, re-assert, and incorporate each of the immediately preceding paragraphs of this Verified Complaint, as if fully set forth herein.

206.     Ms. Levang and Ms. Tuck-Smith contributed substantial time and funds to KKG and/or to the KKG Foundation at the behest of KKG, including promotion of KKG and the KKG Foundation to others.

207.     Ms. Levang and Ms. Tuck-Smith's contributions to KKG and the KKG Foundation were made in reliance on representations and other promises made by KKG that such contributions were part of the promise of engagement with KKG throughout their lifetime as described in the Bylaws.

208.     The term "lifetime member" is commonly used in the KKG community to classify the type of membership held by Ms. Levang and Ms. Tuck-Smith.

209.     KKG represented, through its organizational documents in effect at the time of such contributions and otherwise, that lifetime membership was not cancellable based on expressions of dissent regarding matters of concern to women who are members of KKG or upon objections to violations of KKG's governing documents.

210.     The term "women" was mutually understood by Ms. Levang and Ms. Tuck-Smith and KKG at the time of the formation of the mutual obligations between them by promissory estoppel to mean female individuals.

211.    Ms. Levang and Ms. Tuck-Smith reasonably relied on the promise of lifetime membership in consideration for their membership and the foregoing considerations afforded to KKG or its designated charitable foundation, KKG Foundation.

212.    Defendants KKG and the Fraternity Council knew or should have known Plaintiffs would rely on said statements and promises.

213.    KKG should be estopped from revoking Ms. Levang and Ms. Tuck-Smith's lifetime membership.

<u>**COUNT EIGHT**</u>
**(Wrongful Termination of Membership As a Matter of Public Policy)**

214.    Plaintiffs Patsy Levang and Cheryl Tuck-Smith re-allege, re-assert, and incorporate each of the immediately preceding paragraphs hereof, as if fully set forth herein.

215.    The efforts made by Ms. Levang and Ms. Tuck-Smith to advocate both for the KKG members in the Lawsuit and the Fraternity's compliance with the long-established Purpose articulated in both KKG's Articles and Bylaws is not only supported by the Fraternity's governing documents, but it is also their right as citizens to engage in political expression and association.

216.    Interfering with an association's members' public and civic rights is contrary to public policy.

217.    Further, Ohio recognizes that individuals who hold organizations accountable for wrongdoing play a key role in keeping organizations lawful, honest, efficient, and accountable. The dismissal of members who seek to ensure that an organization's officers and directors honor the governing documents of an organization violates public policy and serves as a chilling effect for members who endeavor to prevent harm to the organization.

218.    The decision of KKG and the Fraternity Council to expel Ms. Levang and Ms. Tuck-Smith is an improper and unlawful infringement on their right to political expression and association and has a chilling effect on all members.

219.    The actions of KKG and Fraternity Council to expel Ms. Levang and Ms. Tuck-Smith for the efforts to enforce KKG's Articles, Bylaws, and Standing Rules send a message to other members of the Fraternity that they will be stripped of their membership should they attempt to protect the Fraternity and enforce its governing documents.

220.    KKG and Fraternity Council are liable to Ms. Levang and Ms. Tuck-Smith for the harm resulting from their expulsion.

221.    KKG and Fraternity Council should be enjoined from infringing on these freedoms in retaliation for efforts by Ms. Levang and Ms. Tuck-Smith to uphold KKG's Purpose and seek compliance from the Fraternity Council with KKG's governing documents.

222.    The Court should order the Fraternity Council's decision to dismiss Ms. Levang and Ms. Tuck-Smith rescinded such that their membership is immediately reinstated.

## COUNT NINE
### (Injunctive Relief)

223.    Plaintiffs Patsy Levang and Cheryl Tuck-Smith reallege, re-assert, and incorporate each of the immediately preceding paragraphs of this Verified Complaint, as if fully set forth herein.

224.    KKG and Fraternity Council have caused Ms. Levang and Ms. Tuck-Smith irreparable damage, which is continuing.

225.    Ms. Levang and Ms. Tuck-Smith have no adequate remedy at law.

226.    Unless KKG and the Fraternity Council are preliminarily and permanently restrained, they will continue to deny Ms. Levang and Ms. Tuck-Smith the benefits of lifetime membership in the fraternity.

227.    KKG and its Fraternity Council must either be enjoined from dismissing or be ordered to rescind the dismissal of Ms. Levang and Ms. Tuck-Smith from their lifetime membership in the Fraternity.

**COUNT TEN**
**(Defamation Per Se)**

228.    Plaintiffs Patsy Levang and Cheryl Tuck-Smith reallege, re-assert, and incorporate each of the immediately preceding paragraphs of this Verified Complaint, as if fully set forth herein.

229.    Section 7.4.B of the Standing Rules provides that an associate or alumna member may be dismissed for violations of the member responsibilities. *See **Exhibit 4**, Standing Rules.

230.    Through its published communications and dismissals, KKG falsely accused Ms. Levang and Ms. Tuck-Smith of violating Fraternity Policies and claimed they misused member contact lists, violated the media policy, attempted to speak for the Fraternity, and violated the Fraternity's human dignity policy.

231.    Upon entering a decision of dismissal, "KKG's Executive Director shall also send notice to the District Director, the Standards Director, the Standards Specialist, and the President of the local alumnae association." *See* Exhibit *4*, Standing Rules, Sect.7.4. B.5.b.

232.    KKG's Executive Director sent the notices of Ms. Levang and Ms. Tuck-Smith's dismissals as required by the Standing Rules.

233.    As a matter of Ohio law, a statement is defamatory if it reflects "injuriously on a person's reputation, or [it] expos[es] a person to public hatred, contempt, ridicule, shame or

disgrace, or [it] affect[s] a person adversely in his or her trade, business or profession." *Gilson v. Am. Inst. Of Alternative Med.*, 2016-Ohio-1324, 62 N.E.3d 754, ¶ 37 (10th Dist. 2016).

234. The communications and dismissals issued by KKG, through Fraternity Council, are defamatory on their face and constitute defamation per se.

235. Members of the Fraternity Council know the communications and dismissals were false.

236. Indeed, KKG promises membership and engagement for life, and alumnae members may only be dismissed through a three-fourths vote of the Fraternity Council. *Exhibit 4*, Standing Rules, 7.4.B.4, at 20. Thus, the mere fact that the Fraternity Council would vote to dismiss alumnae members with a history of substantial service and support to KKG, communicates to the members that Ms. Levang and Ms. Tuck-Smith committed egregious violations of the Fraternity's purposes and standards.

237. Any communication that Ms. Levang and Ms. Tuck-Smith violated Fraternity purposes and standards is false and made without privilege to do so.

238. As a result of the Fraternity Council's decision to dismiss them, Ms. Levang and Ms. Tuck-Smith have suffered harm to their reputation not only among KKG members but also in the community.

239. In addition, the distress resulting from the harm to Ms. Tuck-Smith's reputation has caused her to seek medical treatment for which Fraternity Council is liable.

240. Defamation per se damages are presumed.

241. Members of the Fraternity Council are liable to Ms. Levang and Ms. Tuck-Smith for their conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Susan Jennings, Margo Knorr, Karen Pope, Ann Witt, Patsy Levang, and Cheryl-Tuck Smith, pray for judgment against Defendants, as follows:

1.        As to Count One of the Complaint, Plaintiffs Susan Jennings, Margo Knorr, Karen Pope, and Ann Witt seek an order entering judgment in their favor, on behalf of Kappa Kappa Gamma, in an amount in excess of $75,000 and an order either (a) removing the current members of the Fraternity Council and the appointment of a temporary slate of Council members pending the installation of Fraternity Council at the 2024 Convention following an online election a process monitored by a court-approved independent auditor to ensure a proper election consistent with KKG Bylaws, including an order that no men are nominated to positions of leadership in KKG and that any men are expelled from membership or, alternatively, (b) enjoining the current Fraternity Council members from violating KKG's Articles, Bylaws, Standing Rules and Unanimous Agreement IX, including an order precluding men from being nominated to positions of leadership in KKG and that any men are expelled from membership and (c) requiring KKG's Panhellenic Delegate to abide by and uphold Unanimous Agreement IX in carrying out her duties to KKG and NPC.

2.        As to Count Two of the Complaint, Plaintiffs Susan Jennings, Margo Knorr, Karen Pope, and Ann Witt seek an order either (a) removing the current members of the Fraternity Council and the appointment of a temporary slate of Council members pending the installation of Fraternity Council at the 2024 Convention following an online election a process monitored by a court-approved independent auditor to ensure a proper election consistent with KKG Bylaws, including an order that no men are nominated to positions of leadership in KKG and that any men are expelled from membership or, alternatively, (b) enjoining the current Fraternity Council

members from violating KKG's Articles, Bylaws, Standing Rules, and Unanimous Agreement IX, including an order precluding men from being nominated to positions of leadership in KKG and that any men are expelled from membership and (c) requiring KKG's Panhellenic Delegate to abide by and uphold Unanimous Agreement IX in carrying out her duties to KKG and NPC.

3.      As to Count Three of the Complaint, Plaintiffs Susan Jennings, Margo Knorr, Karen Pope, and Ann Witt seek an order entering judgment in their favor, on behalf of Kappa Kappa Gamma, in an amount in excess of $75,000 and an order either (a) removing the current members of the Fraternity Council and the appointment of a temporary slate of Council members pending the installation of Fraternity Council at the 2024 Convention following an online election a process monitored by a court-approved independent auditor to ensure a proper election consistent with KKG Bylaws, including an order that no men are nominated to positions of leadership in KKG and that any men are expelled from membership or, alternatively, (b) enjoining the current Fraternity Council members from violating KKG's Articles, Bylaws, Standing Rules, and Unanimous Agreement IX, including an order precluding men from being nominated to positions of leadership in KKG and that any men are expelled from membership, and (c) requiring KKG's Panhellenic Delegate to abide by and uphold Unanimous Agreement IX in carrying out her duties to KKG and NPC.

4.      As to Count Four of the Complaint, Plaintiffs Susan Jennings, Margo Knorr, Karen Pope, and Ann Witt seek an order entering judgment in their favor, on behalf of Kappa Kappa Gamma, in an amount in excess of $75,000 and an order either (a) removing the current members of the Fraternity Council and the appointment of a temporary slate of Council members pending the installation of Fraternity Council at the 2024 Convention following an online election a process monitored by a court-approved independent auditor to ensure a proper election consistent with

KKG Bylaws, including an order that no men are nominated to positions of leadership in KKG and that any men are expelled from membership or, alternatively, (b) enjoining the current Fraternity Council members from violating KKG's Articles, Bylaws, Standing Rules, and Unanimous Agreement IX, including an order precluding men from being nominated to positions of leadership in KKG and that any men are expelled from membership and (c) requiring KKG's Panhellenic Delegate to abide by and uphold Unanimous Agreement IX in carrying out her duties to KKG and NPC.

5.     As to Count Five, Plaintiffs seek an order entering judgment in their favor and against Kappa Kappa Gamma and its Fraternity Council and (a) rescinding the dismissal of Ms. Levang and Ms. Tuck-Smith's memberships and (b) enjoining Kappa Kappa Gamma from violating the Ohio Constitution in limiting the membership's right to free speech and in retaliation for efforts and any other KKG member to uphold KKG's Purpose (as set forth in the Article and Bylaws) as well as the Unanimous Agreement IX;

6.     As to Counts Six, Seven, Eight, and Nine Plaintiffs Patsy Levang and Cheryl Tuck-Smith seek an order entering judgment in their favor and against Kappa Kappa Gamma and its Fraternity Council and rescinding the dismissal of their membership and awarding damages in excess of $75,000;

7.     As to Count Ten, Plaintiffs Patsy Levang and Cheryl Tuck-Smith seek an order entering judgment in their favor and against Kappa Kappa Gamma and its Fraternity Council and awarding damages for each of them in an amount in excess of $75,000; and

8.     An award of interest, attorneys' fees, all expenses, costs, and any such other and further legal or equitable relief in favor of Plaintiffs as the Court deems just and proper.

Respectfully submitted,

  _/s/ Angela M. Lavin_

Angela M. Lavin (0069604)
Jay R. Carson (0068526)
WEGMAN HESSLER VALORE
6055 Rockside Woods Boulevard, Suite
200 Cleveland, Ohio 44131
Phone:  (216) 642-3342
Fax:      (216) 642-8826
E-mail: amlavin@wegmanlaw.com
            jrcarson@wegmanlaw.com

And

*Pro Hac Vice pending:*

Sylvia May Mailman (0100520)
Independent Women's Law Center
1802 Vernon Street, NW, Suite 1027
Washington, DC 20009
Phone: (202) 807-9986
Email: may.mailman@iwlc.org


*Attorneys for Plaintiffs*

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury as to any issue herein that is triable of right by a jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

/s/*Angela M. Lavin*

*One of the attorneys for Plaintiffs*

## **VERIFICATION**

STATE OF CALIFORNIA  )
                     )    SS:
COUNTY OF _Orange_   )

Susan Jennings, being first duly sworn according to law, deposes and says that she is one of the Plaintiffs in the within action; that she has read the foregoing Verified Complaint and knows the contents, thereof, and that the allegations contained therein are true to the best of her knowledge and belief based upon the information available to her at the time of execution, except as to matters therein stated to be alleged on information and belief and as to those matters she believes it to be true.

_____
Susan Jennings

SWORN TO BEFORE ME, and subscribed in my presence, the said Susan Jennings, this _18_ day of January, 2024.

_____
NOTARY PUBLIC

JOHN KHOI DANG
Notary Public - California
Orange County
Commission # 2421555
My Comm. Expires Oct 15, 2026

47

**VERIFICATION**

STATE OF NORTH DAKOTA    )
                                 )    SS:

COUNTY OF McLean       )

       Margo Knorr, being first duly sworn according to law, deposes and says that she is one of the Plaintiffs in the within action; that she has read the foregoing Verified Complaint and knows the contents, thereof, and that the allegations contained therein are true to the best of her knowledge and belief based upon the information available to her at the time of execution, except as to matters therein stated to be alleged on information and belief and as to those matters she believes it to be true.

Margo Knorr
Margo Knorr

       SWORN TO BEFORE ME, and subscribed in my presence, the said Margo Knorr, this 22 day of January, 2024.

NOTARY PUBLIC

TOD GRAEBER
Notary Public
State of North Dakota
My Commission Expires April 28, 2026

48

VERIFICATION

STATE OF TEXAS      )
                             )    SS:
COUNTY OF _MAVIS_   )

Karen Pope, being first duly sworn according to law, deposes and says that she is one of the Plaintiffs in the within action; that she has read the foregoing Verified Complaint and knows the contents, thereof, and that the allegations contained therein are true to the best of her knowledge and belief based upon the information available to her at the time of execution, except as to matters therein stated to be alleged on information and belief and as to those matters she believes it to be true.



Karen Pope

SWORN TO BEFORE ME, and subscribed in my presence, the said Karen Pope, this _19TH_ day of January, 2024.

MICHAEL PREZZATO
Notary ID #131248924
My Commission Expires
August 24, 2025

NOTARY PUBLIC

**VERIFICATION**

STATE OF TEXAS     )
                   )    SS:                               216 6428
COUNTY OF Wharton  )

       Ann Witt, being first duly sworn according to law, deposes and says that she is one of the Plaintiffs in the within action; that she has read the foregoing Verified Complaint and knows the contents, thereof, and that the allegations contained therein are true to the best of her knowledge and belief based upon the information available to her at the time of execution, except as to matters therein stated to be alleged on information and belief and as to those matters she believes it to be true.

                                 _Ann Witt_
                                 Ann Witt

       SWORN TO BEFORE ME, and subscribed in my presence, the said Ann Witt, this 23 day of January, 2024.

                                   _Ashlyn Becerra_
                                   NOTARY PUBLIC



ASHLYN BECERRA
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 12/22/26
NOTARY ID 13411829-3