**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| PATSY LEVANG, CHERYL TUCK-SMITH, SUSAN JENNINGS, MARGO KNORR, KAREN POPE, and ANN WITT, | ) ) ) Case No. 2:24-cv-00316-MHW-KAJ |
| | ) |
| *Plaintiffs*, | ) Judge Michael H. Watson |
| | ) |
| v. | ) |
| | ) |
| KAPPA KAPPA GAMMA FRATERNITY, MARY PAT ROONEY, MARIA BROWN, NANCY CAMPBELL, BARB GOETTELMAN, LIZ WONG, KYLE DONNELLY, and BETH BLACK, | ) Magistrate Judge Kimberly A. Jolson ) ) ) **PLAINTIFFS' BRIEF IN** ) **OPPOSITION TO DEFENDANTS'** ) **MOTION TO DISMISS** |
| *Defendants*. | ) |

Now come Plaintiffs, Patsy Levang, Cheryl Tuck-Smith, for themselves, and Susan Jennings, Margo Knorr, Karen Pope and Ann Witt, derivatively, and, pursuant to Fed. R. Civ. P. 12(b)(6) submit their Brief in Opposition to Defendants' Motion to Dismiss. Plaintiffs assert that Defendants' asserted grounds for dismissal based upon the doctrine of *res judicata*, the relevant statutes of limitations, and Defendants' contentions that the claims in the complaint fail to plausibly allege actionable conduct are unsupported by the factual allegations and documents offered in Plaintiffs' Verified Complaint.

Therefore, as more fully explained in the brief attached hereto and incorporated herein, when accepting Plaintiffs' allegations as true for purposes of the motion to dismiss, Defendants' Motion should be denied.

Respectfully submitted,

/s/ Angela M. Lavin

Angela M. Lavin            (0069604)
Jay R. Carson             (0068526)
WEGMAN HESSLER VALORE
6055 Rockside Woods Blvd. N., Ste. 200
Cleveland, Ohio 44131
Telephone: (216) 642-3342
Facsimile:  (216) 642-8826
E-mail:amlavin@wegmanlaw.com
        jrcarson@wegmanlaw.com

And

Sylvia May Mailman (0100520)
Independent Women's Law Center
1802 Vernon Street, NW, Suite 1027
Washington, DC 20009
Telephone: (202) 807-9986
Email: may.mailman@iwlc.org

*Attorneys for Plaintiffs*

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### I.  INTRODUCTION

From its founding in 1870, KKG[1] operated as a single-sex, women-only organization. (ECF 1, Complaint, ¶¶20,65.) That is, until 2021. (*Id.*)  Throughout its history, and still today, KKG represented that it was committed to supporting and promoting women and to defending its right "to exist as a single-sex organization." (*Id.* at ¶¶22, 23, 32, 33, 39-48.)  In spite of that commitment, and notwithstanding the clear and plain language in KKG's Articles of Incorporation, Bylaws and Standing Rules (collectively "Governing Documents") limiting membership to "women," KKG's Fraternity Council ("Fraternity Council") has taken the position that membership includes "women *and* individuals who identify as women." (*Id.* at ¶¶50, 52, 56.) (Emphasis added.) This case arises from a series of actions taken by KKG's Fraternity Council without proper notice to, or authorization of, the membership which effected fundamental changes that undermined the mission and purpose of the more than 150-year-old fraternity[2] and cast out any who might dissent.

Beginning with a position statement on Membership Selection, which KKG alleges to have been prepared in 2015[3], Fraternity Council described KKG as a "single-gender organization" and expanding membership criteria to include "women *and* individuals who identify as women." (ECF 1, ¶50 and 1-6, KKG Position Statements.) The document was never presented to the membership for review, debate, approval or vote. (*Id.* at ¶54.) Fraternity Council made similar representations in the Guide, issued in 2018, and again in the FAQs issued in 2022. (*Id.* at ¶¶52,53,54,56,57.) But at no time did Fraternity Council disclose to the membership that, by issuing these documents, it

---

[1] *See* ECF 1, Complaint at ¶77.  For consistency, terms defined in the Complaint will have the same meaning here.
[2] KKG was formed in 1870, before the term sorority referred to a women's society. (ECF 1, Complaint at ¶20.)
[3] Whether this statement was actually issued in 2015 is questionable. A review of the appellate briefs in the Wyoming Lawsuit indicates there is no mention of this statement in Bylaws Committee.  *See* Appellants' Reply Brief, *Westenbroek v. Kappa Kappa Gamma,* Case No. 23-8065, Document: 010110989560, p.13 (10th Cir. Jan. 24, 2024).

intended to alter the fundamental meaning of KKG's Governing Documents. (*Id.* at ¶59.) Indeed, those Governing Documents have never been amended to redefine the term "woman." (*Id.* at ¶55.) Yet, while Fraternity Council worked to violate KKG's membership criteria and take KKG away from its mission and purpose, it continued to promote itself to new and existing members as an organization that supports and unites women and continued to receive the protections of Title IX. (*Id.* at ¶¶50, 163, 164.) It also permitted the KKG Foundation to solicit donations with continued emphasis on supporting women and "sisterhood." (*Id.* at ¶¶107,165 and Exhibits 23, 24, and 25.) Since the Governing Documents were never modified or amended to reflect what Fraternity Council now describes as its "interpretation" of the term "woman," the members were left to believe these statements had no force or effect. (*Id.* at ¶59.) Members were entirely unaware that Fraternity Council intended to amend the Governing Documents without bringing the matter for a vote by the membership. (*Id.* at ¶60.)[4]

Then, on March 27, 2023, a group of collegiate members filed suit in the Wyoming District Court under the caption, *Westenbroek v. Kappa Kappa Gamma*, Case No. 2:23-CV-00051-ABJ (D. Wy.) (hereafter "the Wyoming Lawsuit"), challenging the admission of a biological male student, who identified as a woman, to KKG's Gamma Omicron Chapter. (ECF 1, ¶¶77-84.) Plaintiffs, Patsy Levang and Cheryl Tuck-Smith, learned of the lawsuit and the admission of the Student[5] to the Wyoming Chapter and openly supported the collegiate members' effort to uphold single-sex nature of the fraternity set forth in the Governing Documents. (*Id.* at ¶7, 85.) For that, they were expelled from KKG on October 27, 2023. (*Id*. at ¶7.)

---

[4] Tellingly, in its Appellee's Brief in the Wyoming Lawsuit, defendants-appellees admitted their intention – "Bylaws enacted in 2022 were (1) presented for consideration by delegates in 2022 to Kappa's convention as intended to be 'inclusive', (2) explained in a FAQs document in 2022 to include individuals who identify as women, and referenced the previously issued position statement;…" *Westenbroek v. Kappa Kappa Gamma*, Case: 23-8065, Document: 010110978097, p.35 (10th Cir. Jan.3, 2024) (hereafter, "Appellee's Brief") Yet, they did not comply with the notice and voting provisions to incorporate the FAQs into the Bylaws. (ECF 1, ¶¶60-63.)

[5] *See Id.* ¶77, male member initiated and admitted to the University of Wyoming Chapter.

Plaintiffs Susan Jennings, Margo Knorr, Karen Pope and Ann Witt ("the Derivative Plaintiffs"), are alumnae members seeking damages and equitable relief, derivatively on behalf of KKG, based on Fraternity Council's (i) violations of the Governing Documents, (ii) taking actions that exceeded the scope of its authority, (iii) efforts to conceal and misrepresent critical information regarding efforts to change the Governing Documents without notice and a vote by the membership, (iv) civil conspiracy to commit a fraud on the members, (v) disregard of their fiduciary duties and (vi) retaliation against members who challenged their misconduct.  Ms. Levang and Ms. Tuck-Smith (collectively, "the Plaintiffs") challenge their dismissals on the grounds that Fraternity Council's decision to expel them breached a contract for a lifetime membership and retaliated against them in violation of their rights to speak freely in challenging the Fraternity Council's improper conduct, as well as damages for the harm their expulsions have caused to their reputations.

In their Motion to Dismiss ("Motion"), Defendants cherry-pick allegations to conflate them with the claims and assertions in the Wyoming Lawsuit to argue that this derivative action is merely a re-litigation of already decided issues. And, they mischaracterize the plaintiffs, here, as a small, rambling group of alumnae members who simply disagree with a ministerial decision made by Fraternity Council.  Further, as to the direct claims, Defendants disavow any obligation to members who challenge their views and hold Fraternity Council accountable for its decisions.

As shown below, Defendants' Motion is without merit and should be denied in its entirety.

## II.    STANDARD OF REVIEW

The notice pleading requirements of Rule 8(a) merely require a short and plain statement of the claim demonstrating that the claimants are entitled to relief.  However, under Rule 9(b), all averments of fraud must be stated with particularity. *In re Nat'l Century Fin. Enterprises, Inc.*, 504 F. Supp. 2d 287, 311 (S.D. Ohio 2007).  This means that a complaint must "(1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Doshi v. Gen. Cable Corp.,* 386 F. Supp. 3d 815, 826 (E.D. Ky. 2019) (citing *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 978 (6th Cir. 2018)).

Under Rule 12(b)(6), Plaintiffs need not prove their case at the pleading stage. A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the sufficiency of the complaint and is granted when "accepting the allegations in the complaint as true and construing them liberally in favor of the plaintiff, the complaint fails to allege 'enough facts to state a claim for relief that is plausible on its face.'" *Redden v. Alpha Kappa Alpha Sorority, Inc.,* No. 1:09CV705, 2010 WL 107015, at *3 (N.D. Ohio Jan. 6, 2010), quoting *Bell Atlantic Corp. v. Twombly*, U.S., 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). A claim is "plausible on its face" when the plaintiff pleads factual allegations that allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662,678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.

Plaintiffs' Complaint has thoroughly pleaded factual allegations supporting both the derivative and direct claims in this case, and, therefore, has met the standards necessary to overcome a motion to dismiss.

## III.    *RES JUDICATA* **DOES NOT BAR PLAINTIFFS' DERIVATIVE CLAIMS**

Defendants claim that the derivative claims in this case (Counts I, II and III) are barred by the doctrine of *res judicata*. They contend that, "all of these claims relate to KKG's interpretation of the term 'woman'," and that this issue was already decided in the Wyoming Lawsuit. Their assertion here is premature at best. While the Wyoming District Court's order was *without prejudice*, whether its determination constitutes and adjudication on merits has not yet been

4

decided by the Tenth Circuit Court of Appeals.  *See Westenbroek v. Kappa Kappa Gamma*, Case No. 23-8065 (10th Cir.).[6]  Even if the Tenth Circuit denies the motion, Defendants' assertions here have no merit.

The plaintiffs in the Wyoming Lawsuit filed a derivative claim seeking (among other things) to invalidate the Student's membership and enjoin the defendants from admitting men who identify as women in KKG.  Of significance, KKG and its President, Mary Pat Rooney, are the only parties named in both the Wyoming Lawsuit and the instant case.  In deciding the motion to dismiss filed by KKG, Ms. Rooney and the KKG Housing Corporation, the Wyoming District Court distilled the plaintiffs' derivative claim to whether Kappa, as a private organization, may interpret its own Governing Documents to define "woman" as including mend who identify as women.  And, in doing so, concluded that it would not invade Kappa's "bedrock right" to interpret its Governing Documents. *Westenbroek,* 2023 U.S. Dist. Lexis 152458, *29.  Defendants now rely on this determination and assert that the District Court's finding in the Wyoming Lawsuit bars all the derivative claims filed by the Plaintiffs in this case.  Defendants are wrong.

The doctrine of *res judicata* encompasses two related concepts – claim preclusion and issue preclusion. *State ex rel. Nickoli v. Erie MetroParks*, 2010-Ohio-606, ¶ 21, 124 Ohio St. 3d 449, 453, 923 N.E.2d 588, 592; *O'Nesti v. DeBartolo Realty Corp.,* 113 Ohio St.3d 59, 2007-Ohio-1102, 862 N.E.2d 803, ¶ 6. "Claim preclusion prevents subsequent actions, by the same parties or their privies, based upon any claim arising out of a transaction that was the subject matter of a previous action." *Nickoli,* 923 N.E.2d at 592.  Issue preclusion prohibits a party from re-litigating

[6] The KKG defendants filed a Motion to Dismiss the appeal, and, though fully briefed, the motion remains pending *Westenbroek,* Case: 23-8065, Document: 010110933203, (10th Cir. Oct. 9, 2023). Of note, KKG took the very opposite view in the District Court's decision in the Wyoming Lawsuit and argued the District Court's decision was not a final appealable order because it was explicitly without prejudice. *See Moore v. Cent. Ohio Drug Enf't Task Foce,* S.D.Ohio No. 2:16-CV-987, 2018 WL 1173041, *3, report and recommendation adopted sub nom. *Moore v. Cent. Ohio Drug Enf't Task Force,* S.D.Ohio No. 2:16-CV-987, 2018 WL 1966153 (Because the Court's order dismissing Plaintiff's earlier complaint was explicitly "without prejudice," the dismissal was not "on the merits" for res judicata purposes.)

an identical issue that was actually and necessarily litigated and decided by a court in a prior lawsuit, even if it is based on a different cause of action. *Id.*

Claim preclusion does not apply here. Even if the Derivative Plaintiffs are in privity with the collegiate members of KKG who filed the Wyoming Lawsuit, the parties and causes of action asserted in this case are different from those in the Wyoming Lawsuit. Thus, there is no mutuality of parties. With the exception of KKG's president, Ms. Rooney, and KKG, the parties are entirely different. *Compare* ECF 1, Complaint *and Westenbroek*, Case No. 2:23 CV 00051-ABJ, Doc. 6, First Amended Complaint. In addition, the Wyoming Plaintiffs assert a single "derivative cause of action" which alleges breaches of fiduciary duties. (*Id.* ¶65.) Here, the Derivative Plaintiffs have named, and seek damages and equitable relief from, each member of Fraternity Council on behalf of KKG for breaches of fiduciary duty, ultra vires acts, fraud and civil conspiracy. (ECF 1.)

In addition, none of the Defendants have consented to jurisdiction in Wyoming for the claims asserted by the Derivative Plaintiffs, and none of the conduct at issue in this case is alleged to have occurred there. Thus, even if the Derivative Plaintiffs sought to join the Wyoming Lawsuit, the Wyoming District Court arguably lacked jurisdiction to hear these claims.

Further, the causes of action in the Wyoming Lawsuit relate specifically to the effect of Fraternity Council's actions on the membership in the Gamma Omicron Chapter in Wyoming. But this case alleges different facts and raises issues regarding a broader course of actionable conduct and a demonstrable failure of the Fraternity Council to act within its authority and within the best interests of the organization and its members. The Derivative Plaintiffs asserted claims against each member of Fraternity Council based on decisions and actions they have taken that caused injury to KKG in Ohio. Absent mutuality of claims and parties, claim preclusion does not apply.

Turning to the concept of issue preclusion, in order for this doctrine to apply, the fact or

issue sought to be barred must have been "actually and directly litigated" and "determined by a court of competent jurisdiction." *State ex rel. Davis v. Pub. Emps. Retirement Bd.,* 174 Ohio App.3d 135, 881 N.E.2d 294, 2007 -Ohio- 6594 (2007) (quoting *Thompson v. Wing,* 70 Ohio St.3d 176, 183, 637 N.E.2d 917.) It is well-established law that "[b]ecause issue preclusion forever precludes litigation with respect to a covered finding, courts err on the side of construing prior ambiguous findings or holdings narrowly." *Merial, Inc. v. Sergeant's Pet Care Products, Inc.*, 806 Fed.Appx. 398, 413 (6th Cir. 2020) (citations omitted.) Moreover, issue preclusion does not apply to other matters that might have been litigated but were not. *See Davis*, 174 Ohio App.3d at 148. "[A]n absolute due process prerequisite to the application of collateral estoppel is that the party asserting the preclusion must prove that the identical issue was actually litigated, directly determined, and essential to the judgment in the prior action." *Goodson v. McDonough Power Equip., Inc.* (1983), 2 Ohio St.3d 193, 201, 2 OBR 732, 443 N.E.2d 978. The proponent of issue preclusion has the burden of establishing its elements. *See Simmons Cap. Advisors, Ltd. v. Bachinski (In re Bachinski)*, 393 B.R. 522, 535 (Bankr. S.D. Ohio 2008); *In re Mullins*, 449 B.R. 299, 302 (Bankr. S.D. Ohio 2011). Defendants cannot meet their burden here.

According to Defendants, the Wyoming District Court's finding that KKG could interpret its own bylaws and define the term "woman" resolves the sole issue in this case. While the definition of the term "woman" may be relevant to the background, context and certain events giving rise to this lawsuit, the issues in this case will not be decided solely on the basis of whether Fraternity Council had a right to unilaterally redefine that term. This case addresses the scope of a board of directors' authority and its obligations to be transparent with, and make necessary disclosures to, the organization's members; grant members an opportunity to be heard – without retaliation - on matters affecting the fundamental nature of the organization; avoid impropriety

through special treatment of certain members; and ensure that at all times that the Board's decisions are for the benefit of the organization.  At a minimum, deciding the claims in this case necessarily require resolving the following issues:

- Whether Fraternity Council's transformation of KKG from a single-sex organization to a single-gender organization requires more than the mere interpretation of an undefined term in the Governing Documents; (*Compare* ECF 1, ¶¶32-36,51,125,128 *and* ¶¶ 50,53,57)

- Whether and under what circumstances Fraternity Council has a legal and fiduciary obligation to disclose to members that positions they advanced on behalf of the Fraternity would result in fundamental changes to the meaning of Governing Documents and mission of the organization;

- Whether and to what extent the failure to disclose the effect of Fraternity Council's positions that they now argue altered the meaning of the Governing Documents constitutes a fraud on the membership;

- Whether the members of the Fraternity Council have improperly granted special treatment to the Candidate, the Student and potentially other unknown biological male members over female members and, if so, whether the Fraternity Council has authority to do so; (*Id.* at ¶159-161.)

- Whether a member's efforts to challenge the Fraternity Council's use of position statements to circumvent the Governing Documents or its efforts to admit and/or promote certain members constitute "fraternity business;"

- Whether, as a matter of law, members may speak freely in challenging Fraternity Council's change in the meaning of the Governing Documents; and

- Whether Fraternity Council can provide a good faith and fair determination in member disciplinary proceedings where the conduct giving rise to the matter involves challenges and criticism of Fraternity Council's conduct; and

- Whether Fraternity Council violates Fraternity Policies and Ohio law for disciplining and expelling members in retaliation for challenging the propriety of their conduct.

None of these issues were presented to, litigated before, or decided in the Wyoming Lawsuit.

Therefore, issue preclusion does not apply to prevent the Court from hearing these issues.

Defendants' Motion to apply the doctrine of *res judicata* is unsupported and should be denied.

## IV.    PLAINTIFFS' DERIVATIVE CLAIMS ARE NOT TIME BARRED

Defendants next assert that Plaintiffs' derivative claims are barred by the four-year statutes

of limitations applicable to claims for breach of fiduciary duty and fraud. Since statute-of-limitation issues often involve mixed questions of fact and law such as when an injury occurred or when it should have been discovered, a motion to dismiss under Rule 12(B)(6) is generally not a proper basis to challenge a complaint. *Davis v. Allen*, Case Nos. C–010165, C–010202, and C–10260, 2002-Ohio-193. *See also Timken Co. v. Robert Bosch, LLC,* No. 5:22-CV-00530-AMK, 2023 WL 3866336, at *3 (N.D. Ohio June 7, 2023) ("Generally, a motion under Rule 12(b)(6), which considers only the allegations in the complaint, is an 'inappropriate vehicle' for dismissing a claim based upon a statute of limitations."), quoting *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013); *Cataldo v. U.S. Steel Corp.,* 676 F.3d 542, 547 (6th Cir. 2012). Here, Plaintiffs' derivative claims arose in 2021 and, thus, are not time-barred.

A claim for breach of fiduciary duty accrues when the claimant's interest is impaired by the breach. *Wells v. C.J. Mahan Const. Co.*, 2006-Ohio-1831, ¶ 29 (Ohio Ct. App. Apr. 11, 2006). *Stokes v. Berick*, No. 98-L-094, 1999 WL 1313668, at *5 (Ohio Ct. App. Dec. 23, 1999). Similarly, in determining whether a party should have discovered fraud, the test is whether sufficient facts existed to alert a reasonable person of the possibility of fraud. *Cundall v. U.S. Bank*, 2009-Ohio-2523, ¶¶ 29-30, 122 Ohio St. 3d 188, 194, 909 N.E.2d 1244, 1250 (2009), citing *Palm Beach Co. v. Dun & Bradstreet, Inc.*, 106 Ohio App.3d 167, 171, 665 N.E.2d 718 (1995).

In this case, the conduct triggering the statute of limitations on both the breach of fiduciary duty claims and the fraud claim began to run (at the earliest) in 2021, when Fraternity Council voted to admit the Candidate.[7] While KKG may have previously described membership to include "individuals who identify as women," that statement did not impair the interests of KKG and its members until Fraternity Council acted on them and admitted a male member. Fraternity Counsel

---

[7] *See* ECF. 1, ¶65, alumna member admitted through the KKG candidate selection process.

authorized the admission of the Candidate in 2021.[8] (*See* ECF 1, ¶¶65-67, 70, 126, 128.)

Likewise, Plaintiffs could not have reasonably discovered the Fraternity Council's agenda to transform KKG from a single-sex to a single-gender organization, without notice to or vote by the membership as required under the Bylaws, until they learned Fraternity Council admitted male members. Fraternity Council's continued efforts to hold KKG out as an organization that "unites women to learn, grow, and inspire positive change" and its solicitations using the stories and experiences of biological women masked its intentions and fraudulently misled members to believe KKG remained committed to the single-sex nature of the organization.  (*Id.* ¶¶106-107, 161-169 and ECF 1-23, 1-24, and 1-25.) Plaintiffs could not have discovered the scope of Fraternity Council's fraudulent conduct until it actually admitted men to membership.  Since that did not occur until 2021, Plaintiffs' fraud claim is timely.

## V.     PLAINTIFFS DERIVATIVE CLAIMS ARE NOT BARRED AS A MATTER OF LAW

### A.   Plaintiffs' Claim for Breach of Fiduciary Duty is Premised Upon Clear Violations of the Governing Documents and Conduct That Exceeds Fraternity Council's Authority.

In Ohio, directors owe a fiduciary duty to the corporation and to the shareholders, collectively. *Thompson v. Cent. Ohio Cellular, Inc.*, 93 Ohio App.3d 530, 540(Ohio Ct. App. 1994). This entails a duty of good faith, a duty of loyalty, a duty to refrain from self-dealing, and a duty of disclosure. *Wing Leasing, Inc. v. M & B Aviation, Inc.*, 44 Ohio App.3d 178, 181(Ohio Ct. App. 1988); *Maas v. Maas*, 2020-Ohio-5160, ¶ 18, 161 N.E.3d 863, 872 (2020).  To state a claim for breach of fiduciary duty in Ohio, a plaintiff must allege: (1) the existence of a duty arising from a fiduciary relationship, (2) a failure to observe the duty, and (3) an injury proximately

---

[8] Arguably, KKG's admission, in its Appellee's Brief (at p.35) in the Wyoming Lawsuit, that it intended the FAQs to affect an amendment to the Bylaws serves as evidence of an additional breach of the Bylaws occurring in 2022.

resulting therefrom. *Strock v. Pressnell*, 38 Ohio St.3d 207, 527 N.E.2d 1235, 1243 (Ohio 1988).

The Complaint's allegations, which must be taken as true for purposes of Defendants' Motion, establish that Fraternity Council owed a duty to KKG and its members to honor the Governing Documents and to act in good faith and in the fraternity's best interests. That duty included an obligation to provide notice and transparency to the members. (ECF 1, ¶¶121-122; R.C. §1702.12(F)(9); R.C. §1702.30.) The Complaint also alleges that, in breach of that duty, Fraternity Council deliberately and knowingly gave an unfair advantage to the Candidate and the Student in connection with their admission to membership. In short, Fraternity Council bent the rules to achieve its policy goal, without telling the membership and put KKG in jeopardy of losing its exemption under Title IX, violating the NPC Unanimous Agreements, and defeating the organization's central purpose. (*Id.* at ¶¶49,60,64,73-74,81, 115,126-131.) Finally, the Derivative Plaintiffs have shown that, as a result of Fraternity Council's conduct, KKG faces losses in membership and financial support and has been incurred damages in the form of legal fees and expenses. (*Id.* at ¶¶134-137.)

While Defendants claim they are entitled to a presumption that their conduct was reasonable and in the best interests of the organization (Motion at p. 11-12.), the authority and arguments they cite serve only to further support Plaintiffs' claims. None of the cases stand for the position that in matters of policy – where the members have NOT agreed on the rules – the association's decision is supreme. *See Putka v. First Catholic Slovak Union,* 600 N.E.2d 797, 802 (Ohio Ct. App. 1991). Indeed, Courts *will* step in when there has been a palpable violation of the corporation's bylaws." *Redden,* No. 1:09CV705, 2010 U.S. Dist. LEXIS 822, at *14. That is exactly what the Derivative Plaintiffs have alleged in their Complaint.

Here, Fraternity Council failed to disclose to its members that in unilaterally redefining the

word "woman" and subsequently issuing its FAQs in April 2022, it intended to effect changes to the Bylaws and, ultimately, to the fundamental nature of the organization without a vote by the membership. (ECF 1, ¶¶58-59,64; *see also* Appellee's Brief, p.35.)  But the FAQs were not subject to vote or otherwise approved by the membership at the 2022 Convention, which would have been necessary for changes to the Bylaws.  *Id. See Zalvin v. Ayers,* 157 N.E.3d 256, 265, 2020 Ohio 4021 ¶22 (Ohio Ct. App. 2020) ("The duty of disclosure applies when a corporation seeks shareholder approval of fundamental changes.") In addition, Fraternity Council's actions in providing special treatment to the Candidate, through promotion to leadership positions over female members, and to the Student, through exceptions to membership qualifications that would have otherwise excluded him from membership, constitute violations of the Governing Documents. (ECF 1, ¶¶65-82, 124-126,130; ECF 1-1, Bylaws, Art. III, IV, and X; ECF 9, Standing Rules filed under seal, Section 1.0.)

Equally unsupported is Defendants' argument that the derivative claims should be dismissed because their interpretation of "woman" was reasonable. But, Plaintiffs' claims are not based on Defendants interpretation of what "woman" means. For this reason alone, the argument fails.  Nevertheless, Defendants' assertion that "the question of who a woman is does not have a straightforward answer"[9] shows why the disclosure and transparency of Fraternity Council's intentions to the members was critical. Assuming, *arguendo,* that Fraternity Council actually considered the "myriad" of sources defining that term, it was also required to consider the impact of its ultimate decision on the future of the fraternity and its members. Fraternity Council's interpretation had the effect of changing the very nature of the organization from a "single sex"

---

[9] To be sure, Plaintiffs and other women know exactly what the term "woman" means.  Defendants' assertion that this term is difficult to interpret undermines and undervalues the experiences that are unique to, and shared only by, women from childhood to adulthood.

organization to a "single gender" organization. Gender and sex are separate concepts. (ECF 1, Complaint ¶35.) It is the "single sex" nature of the organization that served as the foundation for the fraternity's mission and purpose to support and advocate for women, and, significantly, formed the basis for KKG's protections under Title IX and its commitment under the NPC Unanimous Agreement IX. (*Id.* ¶32-34.) By disavowing that aspect of KKG, without notice, debate and a vote by the membership, Fraternity Council interfered with the rights of its members and exceeded the scope of its authority. (*Id.* 142-145,147,150-152.)

### B. The Ultra Vires Claim Properly Encompasses Fraternity Council's Violation of the Governing Documents

Defendants' assertion that the ultra vires claim cannot arise from the dismissals of Ms. Levang and Ms. Tuck-Smith misses the point. The Complaint asserts that Fraternity Council's conduct has broader implications related to the engagement and discipline of members. The Bylaws provide that all members are accountable for inappropriate conduct. (ECF 1-1, Exhibit 1, Bylaws, Art. V, Section 7.) Fraternity Council is not exempt. When Fraternity Council deliberately dismisses members because they advocate for and seek to support other members who raise legitimate concerns regarding the decisions of Fraternity Council, this conduct violates the Fraternity's mission, purpose and purported values. (*Id.*, Bylaws, Art. II at 1.)

The Derivative Plaintiffs properly alleged that Fraternity Council exceeded its authority, failed to conduct its affairs in accordance with the Bylaws, and failed to follow mandatory notice and voting procedures. (ECF 1, ¶¶143-145.) But they also assert that the Fraternity Council exceeded its authority in the method and review of Ms. Levang and Ms. Tuck-Smith's dismissals, such that it adversely affects other members. (*Id.* ¶148-150,152.) Indeed, the extreme and deliberate expulsion of members who challenge improper conduct by Fraternity Council sends a clear message to the remaining members that if they speak up, they will be expelled.

13

## C.  Plaintiffs' Fraud Claim is Properly Supported in the Complaint

Defendants next claim that the Derivative Plaintiffs have failed to plead an actionable claim for fraud because they do not allege that Defendants a had a legal duty to disclose information. This is simply wrong.

As noted above, the fiduciary relationship between a corporation's directors and both the corporation and its shareholders includes a duty of good faith, a duty of loyalty, a duty to refrain from self-dealing, and a duty of disclosure. *Zalvin*, 157 N.E.3d at 265. To that end, the Derivative Plaintiffs allege that Defendants had an obligation to carry out their duties "in good faith and in the best interests of KKG and its members." (ECF 1, ¶¶122, 157.)  *See also Kleemann v. Carriage Trace, Inc.,* Montgomery App. No. 21873, 2007-Ohio-4209, 2007 WL 2343756, at ¶ 43. By definition, "good faith" is "honesty in fact in the conduct or transaction concerned." *DiPasquale v. Costas*, 2010-Ohio-832, ¶126-127, 926 N.E.2d 682, 706-707, citing *Casserlie v. Shell Oil Co.*, 121 Ohio St.3d 55, 57, 2009-Ohio-3, 902 N.E.2d 1, at ¶ 10 (citations omitted). As the Supreme Court of Ohio has explained,

> A lack of good faith is the equivalent of bad faith, and bad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. **It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud.** It also embraces actual intent to mislead or deceive another.

*Vontz v. Miller*, 2016-Ohio-8477, ¶ 33, 111 N.E.3d 452, 461 (Ohio App. Ct. 2016) (citations omitted.)(Emphasis added.)  This is precisely the conduct that Derivative Plaintiffs have pled.

Defendants also incorrectly claim they informed the membership of their intentions through the 2015 position statement. Notwithstanding Defendants' acknowledgement that only "some" policies were publicly available (Motion at p.17), the Derivative Plaintiffs – all alumnae – would not, without some prior knowledge, have any reason to police Fraternity Council's policies

given that for more than 150 years the definition of "woman" was understood.

In any event, as reflected in the Complaint, the fraud and dishonesty related to those statements, which gave rise to the derivative claim, arose from the deliberate omission of key information about Fraternity Council's policy decisions, namely that the position statements, the Guide and the FAQs (none of which were voted on by the membership) were intended by Fraternity Council to amend KKG's Governing Documents. (ECF 1, Complaint ¶60.)  If Fraternity Council had intended the FAQs to modify, amend or change the Bylaws, it was required to present the FAQs to membership for vote.  Instead, it actively concealed the import of those FAQs and the fact that it would be affecting a fundamental change to the mission and purpose of the organization. (*Id. at* ¶64.)  Even worse, Fraternity Council allowed the KKG Foundation to solicit donations from the members who were duped into believing their money would go to programs that support and promote women, without any indication that Fraternity Council determined that it had unilaterally altered the meaning of that word. (*Id. at* ¶¶104-112,166-167.)

### D.  Civil Conspiracy Claim is Properly Supported by Underlying Tort Claims.

The sole basis for Defendants' challenge to the civil conspiracy claim is the alleged absence of an underlying tort. However, as demonstrated above, Plaintiffs' have alleged and supported multiple tort claims. Therefore, on a motion to dismiss, there is sufficient basis to support Plaintiffs' civil conspiracy claim.  Defendants' Motion as to this claim should be denied.

## VI.  THE DIRECT CLAIMS OF PATSY LEVANG AND CHERYL TUCK-SMITH SHOULD NOT BE DISMISSED

### A.  Plaintiffs Pled an Actionable Violation of Ohio's Right to Free Speech

The Defendants take issue with Justice Wright's view in *Eastwood Mall, Inc. v. Slanco,* 68 Ohio St. 3d 331 (1994) that Section 11, Article I's protections are broader than the First Amendment's application to non-government actors was not the majority view in that case. But

15

that is an observation, not an argument. In light of its significantly different text, and consonant with the trends towards greater judicial reliance on text, other Ohio case law, and the decisions of sister state courts interpreting similar provisions, Justice Wright's interpretation is the far more reasonable one. This Court need not overrule *Eastwood Mall* to apply Section 11, Article I to this dispute. But to the extent that *Eastwood Mall*'s application may be uncertain here or that, presented with these facts, the current Ohio Supreme Court might reach a different conclusion than the *Eastwood Mall* majority, it should certify the question to the Ohio Supreme Court.

To begin, the Ohio Constitution is "a document of independent force." *State v. Mole*, 149 Ohio St.3d 215, 2016-Ohio-5124, 74 N.E.3d 368, ¶ 14 (citing *Arnold v. Cleveland*, 67 Ohio St. 3d 35, 42, 616 N.E. 2d 163 (1993). In *Arnold*, the Ohio Supreme Court recognized this long-standing principle: "The United States Supreme Court has repeatedly reminded state courts that they are free to construe their state constitutions as providing different or even broader individual liberties than those provided under the federal Constitution." *Arnold*, 67 Ohio St. at 42 (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 293 (1982). For example, in *City of Mesquite*, the U.S. Supreme Court recognized and enforced due process protections under the Texas state constitution that were "different from, and arguably significantly broader than" the Fourteenth Amendment's protections. *City of Mesquite*, 455 U.S. at 293.

Section 11, Article I of the Ohio Constitution guarantees that "[e]very citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press." Ohio's constitutional free speech protections, ratified twenty-five years after the First Amendment, recognize that citizens have an affirmative right to free *speech. See Pruneyard Shopping Center v. Robins*, 4476 U.S. 74 (1980) (affirming the California Supreme Court's reading of the California

16

constitution's nearly identically worded free speech provision). The First Amendment, in contrast, is a negative right, imposing a limitation on the government's restriction of speech: "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Constitution, 1st Amendment. Presented with the facts of this case, the Ohio Supreme Court would likely apply Judge Wright's reasoning.

First, as is obvious from their texts, Section 11, Article I and the First Amendment employ strikingly different language. In analyzing the meaning of a constitutional provision, the analysis must always start with the provision's plain text. Here, Justice Wright, as well as more recent Ohio appellate decisions, have recognized that the words used by the Framers of Ohio's constitution are distinctly different than those used by the Framers of the First Amendment. *See Ferner v. Toledo-Lucas Cty. Convention & Visitors Bur., Inc.*, 80 Ohio App.3d 842, 847–48, 610 N.E.2d 1158, 1161–62 (6th Dist.1992) (noting that Section 11, Article I, "differs from the United States Constitution in that while both include the prohibition against laws abridging speech, the Ohio Constitution additionally includes an affirmative grant of the right of free speech.").

The Framers of Ohio's 1803 Constitution would have been acquainted with the federal Bill of Rights, yet consciously chose to word Ohio's guarantee in the affirmative. Nor were they alone in recognizing a positive right "to speak freely" in language broader than the First Amendment's. In fact, the majority of state constitutions contain affirmative wording similar to Ohio's. Ohio's sister state supreme courts have read that similar language to guarantee a natural pre-existing right to speak, rather than merely limitation on government action. *See, e.g., Robins v. Pruneyard Shopping Center*, 23 Cal.3d 899, 592 P.2d 341, 345, 153 Cal.Rptr. 854, 858 (1979); *Alderwood Assoc. v. Washington Environmental Council*, 96 Wash.2d 230, 238, 635 P.2d 108, 113 (1981);

17

*Batchelder v. Allied Stores* (1983), 388 Mass. 83, 445 N.E.2d 590; *Commonwealth v. Tate* (1981), 495 Pa. 158, 432 A.2d 1382. Simply put, Ohio's free speech guaranty is broader than the First Amendment and encompasses protection of the right to speak freely. This right does not merely prohibit its limitation by government actors, but by any actors.

Indeed, Ohio appellate decisions predating *Eastwood Mall* make this clear. In *Crossen v. Duffy*, 90 Ohio App. 252, 270–71, 61 Ohio Law Abs. 85, 103 N.E.2d 769, 778 (Ohio Ct. App. 1951), the court of appeals held that the under Section 11, Article I, union members could state a claim against union officials who had retaliated against them based on their criticism of union leadership. The court reasoned that "in view of the provisions of the Constitution of the United States and of the state of Ohio, guaranteeing free speech, that we should construe this [section 11] as intending to deprive members of the union of the right of free and fair criticism, otherwise theirs, although the 1949 Convention appears thus to have construed it and to have punished plaintiffs on that basis." *Id*. at 270-71. The *Crossen* decision is particularly applicable here, where members of an organization who are seeking to use the organizations' processes to bring about internal change, and have been targeted and retaliated against by that organization's current leadership.

The *Crossen* court went so far as to identify the public policy underlying an organization member's right to criticize that organizations without fear of reprisal:

> A strong organization presupposes strong leadership. Such leadership calls forth strong adherents and often strong critics and lively contests, not to be found, because not tolerated, in a totalitarian climate. In our political democracy and in our economic achievements a measure of our strength in this country has been our ability to permit, and benefit by, criticism and the competition which nurtures that strength.

*Id*. at 269. KKG is wrestling with a societal issue that has only recently risen to prominence. KKG, like the union in *Crossen*, is the type of intermediary voluntary institution that Alexis De Tocqueville saw as particularly American and necessary to the preservation of American

18

democracy. Through these institutions—rather than through government fiat-- individuals can work out the new, the complicated, and the messy details of societal change. But as the *Crossen* court recognized, strong organizations and the salutary effects they provide, can exist occurs only when members are free to question their leadership. The Plaintiffs here are not seeking to force their world view on others. They are simply trying to assert their point of view within their organization and have been stymied.

Finally, while this Court does not need to overturn the *Eastwood Mall* majority to uphold the Plaintiffs' Ohio constitutional rights, the Ohio Supreme Court, "[l]ike the United States Supreme Court," has recognized that "our precedents are not sacrosanct, for we have overruled prior decisions where the necessity and propriety of doing so has been established." *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 44 (Ohio 2003). But in light of the plain differences in the text, *Eastwood Mall* was wrongly decided. The *Eastwood Mall* majority conducted little in the way of analysis of the state constitutional claim. Further the *Eastwood Mall* case, which involved physical access and occupation of private property—as opposed to online dissent here—was decided thirty years ago. The world and the concept of what constitutes free speech has changed drastically since then. Expressing the idea that a woman means only a biological woman—commonplace in 1994--is today cause for dismissal in some circles. In holding that Washington's free speech protections included protection from nongovernment actors, the Washington Supreme Court held that "[t]he law is not a static concept and it expands to meet the changing conditions of modern life." *Alderwood Assoc.*, 96 Wash.2d at 238, 635 P.2d at 113 (citing *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819); *Robins*, 23 Cal.3d 899, 592 P.2d at 345, 153 Cal.Rptr. at 858. Life has changed since 1994, and *Eastwood Mall* deserves another look. To the extent that this Court would seek further guidance, it should certify

19

the question to the Ohio Supreme Court.

**B. Plaintiffs' Claim for Wrongful Termination is Well Supported.**

Defendants contend that Plaintiffs' wrongful termination claim fails because (i) they did not specifically deny the conduct alleged by KKG but only asserted that their conduct was justified and (ii) they received the due process to which they were entitled. Defendants' assertions demonstrate that Fraternity Council either improperly applied the fraternity policies or Defendants flatly disregarded their responses – under either scenario, the decision to expel Ms. Levang and Ms. Tuck-Smith was not based on a fair and unbiased consideration of the issues or facts but was an effort to silence them for openly challenging the propriety of Fraternity Council's conduct.

At the outset, the Complaint alleges that immediately after Ms. Levang and Ms. Tuck-Smith reached out to members to show support of the issues raised by the plaintiffs in the Wyoming Lawsuit and sought to preserve the single sex nature of KKG, they were contacted by Fraternity Standards Director and ordered to cease using member contact information to communicate with members on these issues, and their access to this information was cut-off. (ECF 1, ¶¶6-7, 89-90.) When they continued to raise alarms about violations of the Fraternity's Governing Documents, Fraternity Council notified them they were being considered for dismissal. (*Id.* at ¶96.) Fraternity Council's decision was swift and severe. Within days of receiving their responses, Fraternity Council voted to expel them from the fraternity. (*Id.* at ¶¶99,100.) Now, Fraternity Council claims dismissal was warranted because Ms. Levang and Ms. Tuck-Smith didn't deny their efforts to preserve women's spaces and challenge Fraternity Council's conduct.

It is true that, absent mistake, fraud, collusion, or arbitrariness, the decisions of a non-profit organization related to internal affairs will not be disturbed. *Solomon v. Edgewater Yacht Club, Inc.,* 519 N.E.2d 429, 35 Ohio Misc.2d 1 (Ohio Mun. Ct. 1987). But this very conduct is present

20

here. As discussed above, the Derivative Plaintiffs have soundly demonstrated that Fraternity Council has failed to act in good faith, acted outside the scope of its authority and engaged in fraud and collusion to advance an agenda that would expand membership criteria without any notice, debate or vote by the membership.  Therefore, under the circumstances here, Fraternity Council's decision to terminate Ms. Levang and Ms. Tuck-Smith, therefore, requires scrutiny.

Ms. Levang and Ms. Tuck-Smith acknowledge that they had an opportunity to respond to the allegations against them, and they did.  But contrary to the contentions in Defendants' Motion (at p.19), due process requires more than notice and hearing in accordance with the organization's bylaws.  Due process in a private organization requires ***the absence of bad faith***, compliance with the organization's constitution and bylaws, and natural justice.  *Redden,* 2010 WL 107015, *5. A private organization cannot expel a member "except as a result of fair proceedings which may be provided in organization bylaws, carried forward in an atmosphere of good faith and fair[sic] play." *Id.* at *6, citing *Normali v. C.A.L. U.,* 39 Ohio App.2d 25, 28, 315 N.E.2d 482 (Ohio Ct. App. 1978).  Fraternity Council may have followed the process set forth in the bylaws, but the allegations here establish that they did not act in good faith.

For instance, Fraternity Council alleged Ms. Levang and Ms. Tuck-Smith violated KKG's policy regarding the use of member contact information for non-fraternity business when they sent email communications to members regarding the admission of the Student to the Wyoming Chapter and advised that the Student would have access to women's only spaces. (Defendants;' Motion at p. 17-18.)  Both Ms. Levang and Ms. Tuck-Smith responded to and challenged these accusations.  (ECF 1-15, 1-16, 1-19, 1-20.)  And, in doing so, they raised legitimate concerns regarding Fraternity Council's own misconduct. They explained that their communications to members in support of the plaintiffs in the Wyoming litigation were necessary to bring to light

conduct by the Fraternity Council that was not in the best interests of the fraternity. Ms. Tuck-Smith explained that "[t]he Fraternity's leadership has not acted in the best interests of the organization or its membership," and her communications served to bring awareness to the membership of the lawsuit and, more importantly, the facts giving rise to it. (ECF 1-11 and ECF 1-19.) Similarly, Ms. Levang responded:

> The lawsuit raised numerous claims about the failure of the Fraternity to follow its own bylaws and standing rules. It is not a violation of the policy to communicate with the membership regarding those claims and/or areas in which members can pursue an appropriate remedy *on behalf of* the Fraternity.

ECF 1-20. (Emphasis in original.) Fraternity Council's allegations that Ms. Levang and Ms. Tuck-Smith improperly used member information to communicate about "non-fraternity business" prompts the question – if communication among members about Fraternity Council's conduct and the propriety of membership decisions is not fraternity business, what is?

Similarly, Fraternity Council accused Ms. Levang and Ms. Tuck-Smith of violating KKG's human dignity policy and engaging in discriminatory conduct for referring to the Student as a man and. (ECF 1-20,1-21.) Yet, the protections of Title IX apply to protect KKG's right to discriminate on the basis of sex. KKG has been a single-sex organization for more than 150 years. Ms. Levang and Ms. Tuck-Smith had a legitimate basis to question and challenge those actions by Fraternity Council's which were intended to eliminate KKG's status as a women-only, single-sex organization without notice, debate and a vote of the membership. Fraternity Council's allegations of discriminatory conduct serve merely as pretext to terminate members who have a view opposing that of Fraternity Council. Taking these facts as true for purposes of Defendants' Motion, Plaintiffs have demonstrated that their termination is an improper act by Fraternity Council to chill opposing

22

viewpoints.[10]

### C. The Contract and Quasi-Contract Claims Arising from the Dismissals.

"Constitutions and bylaws entered into by an association and consenting parties constitute a contract between the association and its members." *Ulliman v. Ohio High Sch. Athletic Assn.,* 2009-Ohio-3756, ¶ 50, 184 Ohio App. 3d 52, 62–63, 919 N.E.2d 763, 771 (Ohio Ct. App. 2009)*; Internatl. Bhd. of Elec. Workers, Local Union No. 8 v. Gromnicki*, 139 Ohio App.3d 641, 646, 745 N.E.2d 449 (Ohio Ct. App. 2000). Ms. Levang and Ms. Tuck-Smith fully performed their obligations to KKG. (ECF 1, ¶¶93-95.) At the time of their terminations, each had been a member of KKG for more than fifty (50) years. (ECF, ¶194.) Through its Governing Documents and member communications, KKG promises members lifetime membership. (*Id.* at ¶195-196.) Ms. Levang and Ms. Tuck-Smith have been dedicated to the KKG mission and purpose throughout their membership. Indeed, Ms. Levang served in various positions of leadership throughout her time in KKG, including trustee and president of the KKG Foundation and co-leader of the KKG Leadership Academy Campaign. (*Id.* at ¶3.) Ms. Tuck-Smith was a founding member of the Chico, California Alumnae Association and served as historian for the Gamma Omicron Chapter. (*Id.* at ¶4.)

Both Ms. Levang and Ms. Tuck-Smith reasonably relied on the representations made by KKG and trusted that, absent a violation of the KKG rules and policies, they would remain members for life. Fraternity Council's decision to terminate their membership for alleged violations of fraternity policies is a pretext and unjustified retaliation against Ms. Levang and Ms. Tuck-Smith for their criticism of Fraternity Council's conduct. Fraternity Council's conduct

---

[10] *See* e.g. *Van Daele v. Vinci*, 51 Ill.2d 389, 282 N.E.2d 728,731 (Ill. App. 1972): "While agreeing that the Board did follow the procedure set out in the bylaws for disciplinary hearings, we cannot find the defendants' final contention persuasive. There are too many factors indicating that the proceedings were in fact not good faith disciplinary hearings, but in reality, an attempt to silence and censure dissident members of the association."

violates KKG's policy against retaliation for reports of misconduct. (*Id.* ¶¶200-202.) Accepting Plaintiffs' allegations as true, they have pled a valid claim for breach of contract, and Defendants' Motion should be denied.

Likewise, Plaintiffs' promissory estoppel claim in properly pled. Ohio courts routinely hold that a promissory estoppel claim may be pled in the alternative to a breach of contract claim. *Michaela Bohemia, LLC v. FedEx Freight, Inc.*, 2023 WL 318069 *4 (S.D. Ohio Jan. 19, 2023). Simply because Plaintiffs cannot recover damages under both theories of liability does not bar them from bringing both claims in this Complaint. (*Id.*) Plaintiffs promissory estoppel claim is properly pled and should not be dismissed.

### D. Plaintiffs Injunctive Relief is Permissible

Defendants assert that Plaintiffs cannot maintain a claim for injunctive relief. To bring a claim for injunctive relief a plaintiff must show a past injury and the threat of immediate future injury. *Finess Express, LLC v. Total Quality Logistics, LLC,* 2021 WL 1192521 (S. D. Ohio Mar. 30, 2021). Courts have denied requests to dismiss stand-alone claims for injunctive relief at the pleading stage, where a party's other claims provide an avenue to obtain injunctive relief. *See Finess Express, LLC,* at *4; *Ripple Junction Design Co. v. Olaes Enterprises, Inc.,* No. 1:05-CV-43, 2005 WL 2206220, at *5 (S.D. Ohio Sept. 8, 2005) ("Dismissing … claim … because it is captioned as a cause of action rather than a claim for relief elevates form over substance.") That is exactly the case here. Plaintiffs' direct claims seek injunctive relief to prevent Ms. Levang and Ms. Tuck-Smith's expulsion. Because these claims provide a plausible basis from which to award injunctive relief, Plaintiffs' claim for injunctive relief should not be dismissed.[11]

---

[11] To the extent the Court deems it necessary and appropriate to the efficiency of the proceedings, this technicality can be remedied through an amendment of the pleadings.

### E. Plaintiffs Have Properly Pled a Claim for Defamation Per Se

The final count of the Complaint asserts a claim for defamation. Defendants do not assert that Plaintiffs have failed to plead a claim which, if proven, would constitute defamation per se. *See Wilson v. Wilson*, 2d Dist. Montgomery No. 21443, 2007-Ohio-178, 2007 WL 127657, ¶ 13. Rather, Defendants assert the notice and communication of their expulsion is true and, therefore, is not actionable. The "truth of the statements is a matter of fact and is not properly determined at the motion to dismiss stage, unless the truth is undisputed." *Hersh v. Grumer*, 2021-Ohio-2582, ¶ 23, 176 N.E.3d 1135, 1145 (Ohio Ct. App. 2021). *See also Yacko v. Gen. Motors Co.,* No. 1:23-CV-01578-PAB, 2024 WL 866321, at *9 (N.D. Ohio Feb. 28, 2024) ('a plaintiff at the Rule 12(b)(6) stage need only allege that a defamatory statement was false to survive dismissal."), citing *Swartz v. DiCarlo*, 2014 WL 8097138, at *3 (N.D. Ohio Oct. 21, 2014).

Here, the truth of the statements in the notice of dismissal is squarely in dispute – Ms. Levang and Ms. Tuck-Smith have denied that they violated any fraternity policies. Therefore, under this Court's required Civ.R. 12(b)(6) standard of review, it must presume that the Defendants' statements were false because that is what Plaintiffs have alleged in their complaint. *Hersh*, 2021-Ohio-2582, ¶ 23, 176 N.E.3d at 1145. Defendants' Motion to dismiss this Count of the Complaint should be denied.

### VII.  CONCLUSION

For all of the foregoing reasons, this Court should issue an Order denying Defendants' Motion to Dismiss in its entirety.

Respectfully submitted,

*/s/ Angela M. Lavin*

Angela M. Lavin          (0069604)
Jay R. Carson           (0068526)
WEGMAN HESSLER VALORE
6055 Rockside Woods Blvd. N., Ste. 200
Cleveland, Ohio 44131
Telephone: (216) 642-3342
Facsimile: (216) 642-8826
E-mail:amlavin@wegmanlaw.com
        jrcarson@wegmanlaw.com

And

Sylvia May Mailman (0100520)
Independent Women's Law Center
1802 Vernon Street, NW, Suite 1027
Washington, DC 20009
Telephone: (202) 807-9986
Email: may.mailman@iwlc.org

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a copy of the foregoing *Brief in Opposition to Defendants'*
*Motion to Dismiss* was filed electronically with the Court this ___ day of April 2024.  Notice of
this filing will be sent by operation of the Court's electronic filing system to all parties indicated
on the electronic filing receipt. All other parties will be served by U.S. Mail. Parties may access
this filing through the Court's system.

*/s/ Angela M. Lavin*
*One of the Attorneys for Plaintiffs*
